STATE OF NORTH CAROLINA

COUNTY OF CHOWAN

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25-CVS-
25CV000081-200

The Edenton-Chowan Board of Education, a Body Corporate, a/k/a Edenton-Chowan Public Schools,

Plaintiff,

v.

Schneider Electric Buildings Americas, Inc.,

Defendant.

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

**NOW COMES** Plaintiff, The Edenton-Chowan Board of Education, a Body Corporate, alternatively known as Edenton-Chowan Public Schools, by and through undersigned counsel, complaining of Defendant, Schneider Electric Buildings Americas, Inc., by alleging and saying as follows:

**Parties**

1. Plaintiff, The Edenton-Chowan Board of Education, a Body Corporate, alternatively known as Edenton-Chowan Public Schools ("Plaintiff Board"), that oversees the operations of the Edenton-Chowan School District, a North Carolina PK-12 public school district in Chowan County, with its principal place of business located in Edenton, North Carolina.

2. Defendant Schneider Electric Buildings Americas, Inc. ("Defendant Corporation") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Carrollton, Texas.

**Jurisdiction and Venue**

3. Defendant Corporation has received proper service before the Court pursuant to Rule 4 of the North Carolina Rules of Civil Procedure.

4. The Court has personal jurisdiction over this matter pursuant to N.C. Gen. Stat. §1-75.4.

5. The Court has subject matter jurisdiction over this matter pursuant to N.C.G.S. §7A-240 and N.C.G.S. §7A-243.

EXHIBIT
A


Electronically Filed Date: 3/7/2025 2:59 PM Chowan Superior Court County Clerk of Superior Court

6. Venue is appropriate pursuant to N.C.G.S. §1-82.

## **Factual Allegations**

7. In the wake of the COVID-19 pandemic, Edenton-Chowan Public Schools applied for a federal grant through the American Rescue Plan Elementary and Secondary School Emergency Relief Fund, known as "ESSER III.[1]"

8. ESSER III was designed to help state and local educational agencies address the impact of the COVID-19 pandemic on students and schools. At the time of its implementation, ESSER III provided for the safe reopening of schools that closed due to the pandemic and allowed for schools that remained open to sustain safe operations. Upon acceptance of ESSER III funds, applicants were required to show that the funds promoted safe school operations.

9. In 2021, Edenton-Chowan Public Schools started to resume normal school operations. Upon return to full-time in-person instruction, students, faculty, and staff complained of uneven cooling, heating, and air flow in White Oak Elementary School (hereinafter "White Oak"), D.F. Walker Elementary School, (hereinafter "D. F. Walker"), and Chowan Middle School—all part of Edenton-Chowan Public Schools, under the supervision of Plaintiff Board.

10. To ensure that the students, faculty, and staff were able to sustain a professional school environment, Plaintiff Board developed a plan to rebuild existing heating, venting, and air conditioning (hereinafter "HVAC") systems at White Oak, D.F. Walker, and Chowan Middle School and submitted its application for ESSER III funds, which were ultimately awarded.

11. Defendant Corporation bid for the project to design and construct new HVAC systems, and to perform cooling tower renovations at all three schools.

12. Upon information and belief, Defendant Corporation knew that the project it bid on with Plaintiff Board was funded through ESSER III, a federal grant that had strict requirements that the funds be used to promote safe school operations.

13. Upon information and belief, Defendant Corporation knew that projects funded through ESSER III had strict reporting requirements by its customers, including Plaintiff Board,

---

[1] The American Rescue Plan (ARP) Elementary and Secondary Schools Emergency Relief (ESSER III) Fund provides nearly $122 billion to states to help safely reopen and sustain the safe operation of schools and address the impacts of the coronavirus disease 2019 ("COVID-19") pandemic on the Nation's students by addressing students' academic, social, emotional, and mental health needs. Of this amount, NC received $3.6 billion. *See* https://www.dpi.nc.gov/districts-schools/federal-program-monitoring/elementary-and-secondary-schools-emergency-relief-esser-funds#:~:text=NC%20State%20Plan%20for%20the,program%20and%20track%20its%20outcomes.

to the federal government to ensure that the federal funds were being used for their intended purpose.

14. Upon information and belief, the historical function of Defendant Corporation was to develop technologies and solutions for electricity distribution, not HVAC design and construction.

15. Upon information and belief, Defendant Corporation began bidding on HVAC projects funded through ESSER III, despite its inexperience with the design and construction of HVAC systems.

*Terms of the Initial Agreement with Defendant Corporation*

16. On or around December 7, 2021, Plaintiff Board signed an "Agreement for Turnkey Design and Construction Services (hereinafter "Initial Agreement")" with Defendant Corporation which expressly and impliedly contemplated that Defendant Corporation would design and rebuild the existing HVAC systems at all three schools to ensure that the HVAC systems were in commission. See Exhibit 1 for Initial Agreement.[2]

17. The Initial Agreement memorialized meetings between Plaintiff Board and Defendant Corporation and provided for a project that included the design and construction of new HVAC systems, and cooling tower renovations, at White Oak Elementary School (hereinafter "White Oak"), D.F. Walker Elementary School, (hereinafter "D. F. Walker"), and Chowan Middle School, all part of Plaintiff Board (hereinafter the "Project").

18. Defendant Corporation included a "design fee" as a term of the Initial Agreement in the amount of $67,500.00.

19. Plaintiff Board paid Defendant Corporation $67,500.00 as a design fee, that served as assurance and notice to proceed with the construction portion of the Project and also served as consideration paid by Plaintiff Board to Defendant Corporation to ensure that Defendant Corporation complied with all applicable laws, among all other terms of the Initial Agreement.

20. Defendant Corporation's Initial Agreement contained an entire section on Design/Builder's Performance, with several notable provisions including a standard of performed promised to Plaintiff Board:

> **Section 3.2. Standard of Performance.** Design/Builder represents and warrants that it has the professional skill, knowledge and experience

[2] Plaintiff Board incorporates by reference the Initial Agreement into the terms of its Complaint by attaching the Initial Agreement as Exhibit 1.

> necessary to perform and complete the Project in a timely and competent manner. Design/Builder shall perform, or cause to be performed, the Project using at least such degree of care as is reasonably expected of professionals providing similar services to Customers within the State of North Carolina in similar circumstances (and considering the Customer's goals and any financial or other constraints made known to Design/Builder before or after the Effective Date).

See Exhibit 1, Pg. 6, Section 3.2.

21. Notably, the Initial Agreement drafted by Defendant Corporation contained an express provision promising that the design and construction work performed by or under the supervision of Defendant Corporation would be in compliance with all legal requirements, specifically:

> **Section 3.6. Design/Builder's Compliance with Law.** Design/Builder and each of its Subcontractors shall perform the Project in compliance with all applicable federal, State of North Carolina and local laws, rules and regulations (collectively, Legal Requirements").

See Exhibit 1, Pg. 7, Section 3.6.

22. The importance of this provision cannot be overlooked, as Section 3.6 of the Initial Agreement ensured Plaintiff Board that Defendant Corporation would perform the design and build work in accordance with North Carolina State Building Code § 401.2 and Table 403.3.1, which dictates that the ventilation requirements for occupied spaces, including educational spaces, must be adhered to in order to ensure adequate air quality and comfort for the occupants.[3]

23. Defendant Contractor expressly warranted its work performed pursuant to the Initial Agreement and the construction amendment by expressly stating, in part, that Defendant Contractor:

> "...warrants that such work will confirm to the requirements of the Contract Documents and will be free from defects, except those inherent in the quality of the work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective."

See Exhibit 1, Pg. 7, Section 3.8.

[3] See North Carolina State Building Code § 401.2 and North Carolina State Building Code Table 403.3.1

24. Defendant Corporation included in its defined scope of work to Plaintiff Board for the Project a written list of work to be performed pursuant the Initial Contract, including, but not limited to:

Design/Builder Will Provide Customer with the Following:

A. Proposed Scope of Construction Work
   a. Bi-Polar Ionization at White Oak ED, D.F. Walker ES, & Chowan MS
B. A Description of How the Proposed Work Would Interact with the Existing Equipment in the Facilities
C. A Completed Construction Amendment Contract
D. Proposed Preliminary Construction Scheule
E. Proposed lump-sum Construction Fee

See Exhibit 1, Exhibit A "Scope of Work – Design Phase of Project."

25. The "design phase" of the Project included conceptual development, design development, and field investigations in anticipation of a final design completion meeting, before entering the construction phase of the Project.

26. The terms of Initial Agreement, and all phases of the design process, were slated for completion by Defendant Corporation in March 2022, in time for Plaintiff Board's March meeting.

27. Plaintiff Board relied on the education, experience, and training of the professionals working for or associated with Defendant Corporation to move on the construction phase of the Project.

*Terms of the Construction Amendment with Defendant Corporation*

28. Based on written and verbal promises made by the professional working for or associated with Defendant Corporation, the "Amendment and Notice to Proceed with the Construction Phase" pursuant to the terms of the Initial Contract (hereinafter "Construction Amendment") was executed by Plaintiff Board on March 9, 2022. See Exhibit 2 for Construction Amendment.[4]

[4] Plaintiff Board incorporates by reference the Construction Amendment into the terms of its Complaint by attaching the Construction Amendment as Exhibit 2.

29. The Construction Amendment laid out the scope of construction for the schools and specifically included both mechanical and automation work for the repair and rebuild of the HVAC systems at White Oak, D.F. Walker, and Chowan Middle School.

30. White Oak and D.F. Walker were constructed at relatively the same time, with like design and construction, and are positioned side-by-side. White Oak and D.F. Walker will be referred to hereafter in the Complaint collectively as the "Subject Schools," unless otherwise delineated herein. As such, the scope of construction that Defendant Corporation contracted with Plaintiff Board to perform at the Subject Schools was substantially similar.

31. The scope of work at White Oak included the following:

Mechanical Scope of Work

a. Secure necessary permits and use construction documents provided by Schneider Electric.
b. Isolate and disconnect condenser water piping to thirty-two (32) existing water source heat pumps using available Isolation valves in mezzanine or mechanical room. Remove existing flexible hose connectors, Isolation valve and balancing valve. Remove condensate p-trap and drain piping as needed to allow far new work.
c. Disconnect electrical and power wiring to unit and save for re-use.
d. Provide thirty-two (32) new water source heat pumps with new isolation valves on supply/return cartridge type automatic balancing valve, y-strainer, and 18"(minimum length) flexible hose connectors. All new devices shall match equipment connection.
e. Extend supply and return air duct to new equipment connection and include flexible duct connectors. Any return air plenum boxes that may be removed during demolition shall be replaced.
f. Install condensate drain, related trap and extend new piping to existing.
g. Provide water balance and written report at building system and cooling tower pumps.
h. Provide air balance to each new water source heat pump to include supply, return and outside air reading. Provide air side test and balance and written report.
i. Extend existing power and control wiring to new unit.
j. Furnish and install bi-polar ionization device into existing supply air duct of each water source heat pump. Provide transformer and associated power and low voltage wiring on new unit. Bi-polar ionization shall be based on PlasmaAir model Autoclean 1560 or approved equal and sized for the nominal CFM of each unit.
k. Provide equipment startup and validate warranty. Startup services shall include confirmation that all duct mounted smoke detectors are operating.
l. Condenser Water Piping Repairs: Contractor shall replace selective condenser water supply and return 6" size mains and including 2-1/2" piping to WSHP tagged 44, 45 and 46. Refer to concept drawing fer

schematics and drawing. New piping shall be CPVC schedule 80 and flanged to existing schedule 80 PVC mains.

m. Perform equipment startup services to existing make-up air units. Provide recommended service repairs as needed to recommission the equipment.
n. Repair or replace (as needed) the power wiring whip to existing hot water pump tag P-4.
o. Install new motor on MAU-1 for heat wheel.
p. Replace Belts, Bearings, Pulleys as necessary on MAU 1,2,4. All units will be cleaned, and bearings greased, and dampers lubed.
q. Provide cooling tower rebuild as recommended by equipment manufacturer (Evapco):

- Clean tower Interior
- Replace fill media, drift eliminators and inlet louver material with new
- Install new OEM bearing and shaft kit
- Replace Steel Support on one side of tower base.

Automation Scope of Work

a. Remove thirty-two (32) existing UC400 controllers from WSHP and save for re-use in new units once replaced
b. Re-Install thirty-two (32) UC400 controllers inside new WSHP and reconnect all controls wiring
c. Re-use existing Trane temperature sensors
d. Provide point to point commissioning
e. Programming and checkout to be performed by Trane Controls Technician

See Exhibit 2, Exhibit D, "Scope of Construction Work."

32. The scope of work at D.F. Walker included substantially the same scope of work as White Oak, except for the following distinctions:

- Instead of removing and replacing "32" water source heat pumps, Defendant proposed removing and replacing "37" water source heat pumps at this school.
- The evaluation of the Makeup Air Units differed in that the scope for D.F. Walker included recommendations for the following:
- Replace MAU-1 Heat Wheel
- Replace Belts, Bearings, Pulleys as necessary on MAU 1,2,4,5,6,7. All units will be cleaned, and bearings greased, and dampers lubed.
- The manufacturer of the cooling tower at D.F. Walker is BAC, instead of Evapco. Defendant's recommendations for the rebuild of the cooling tower differed in that Defendant recommended only that the interior of the tower be cleaned; that the fill media be replaced; that new fill supports be installed; and that existing stainless-steel supports and louvers be reused.

*Id.*

33. In addition to the scope of construction work, a Preliminary Construction Schedule was set as follows:

| | |
|---|---|
| Contract Execution | March 1st, 2022 |
| Final Engineering and Bid Documents | March-May 2022 |
| Equipment Ordering | April-June 2022 |
| Installation Period | September 2022-June 2023 |
| Start Up | Continuous Upon Installation |
| Close Out | July-August 2023 |

See Exhibit 2, Exhibit E, "Preliminary Construction Schedule."

34. Defendant Contractor's Initial Agreement and Construction Amendment expressly and impliedly warranted to Plaintiff Board that the design and build work performed by Defendant Contractor at the Subject Schools would ensure that the HVAC systems at the Subject Schools functioned for their intended purpose—to regulate the air flow in the schools including temperature, flow, and relative humidity.

35. Based on the terms, promises, and warranted outlined by Defendant Contractor in meetings, and in the Initial Contract and Construction Amendment, Plaintiff School paid a total fee to Defendant Corporation in the amount of $1,598,866.00, inclusive of the design fee for HVAC systems that continue to malfunction to this day, and are otherwise not in compliance with the requirements of the North Carolina Building Code.

*Discovery of System Failures*

36. Defendant Corporation allegedly performed the design work required to start the construction phase from in or around December 2021 through March 2022.

37. Defendant Corporation did not report substantial completion of the Project until approximately the end of August 2023, right before temperatures fall and the air becomes drier, in Chowan County.

38. Given the time of year the Project was completed, it was not until approximately June 2024 when the humidity in the Subject Schools became intolerable for students, faculty, and staff, and Plaintiff Board knew it had a serious problem.

39. Around this time, the air quality was so poor in the Subject Schools that organic growth started to appear on walls, baseboards, desks, chairs, and any available surface conducive to microbes.

40. Plaintiff Board contacted Defendant Corporation to notify it of the problem and simultaneously contacted a mold remediation company to ensure that the safe operation of the Subject Schools would not be hampered in the upcoming school year.

41. Plaintiff Board incurred a bill of approximately $700,000.00 for mold remediation caused by poor air conditions in both schools.

42. When Defendant Corporation was invited by Plaintiff Board to the site to evaluate the reported issue, Greg Dickson, an employee, or otherwise affiliated with Defendant Corporation acting on its behalf told Maintenance Manager for Edenton-Chowan Public Schools at the time, Chris Brabble, that, "We've got them all *running*, but they are not *working*."

43. In or around August 2024, the temporary recommendation of Defendant Corporation was that Plaintiff Board turn off the Make-Up Air Units (hereinafter "MAU") until a permanent solution could be identified or installed.

44. It was only then that Defendant Corporation told Plaintiff Board that the HVAC systems in the Subject Schools were "obsolete" and needed to be "upgraded." Defendant Corporation only expressed this to Plaintiff Board after accepting $1,598,866.00 of ESSER III funds award for the safe operation of the Subject Schools.

45. Defendant Corporation's suggestion that the existing MAU's could not service the existing HVAC systems at the Subject Schools was surprising to Plaintiff Board, given that Defendant Corporation was paid to design and build the same and given the fact that the Construction Amendment promises that Defendant Corporation would recommission and service the MAUs.

46. The solutions suggested by Defendant Corporation in a November 2024 board meeting held by Plaintiff Board included two solutions—Solution A: "Replace Energy Recovery Wheels ("ERW") with Dedicated Outside Air System ("DOAS")"; or Solution B: "Modify Existing Makeup Air Units and rebalance system to new reduced Exhaust and Ventilation."

47. Despite Defendant Corporation being in charge of design, it was never mentioned to Plaintiff Board, prior to the issues at the Subject Schools, that Solution A was available.

Defendant Corporation presented Solution A at the additional cost of $1,500,000.00, or more to Plaintiff Board.

48. Further, Solution B was incorporated in the Initial Agreement and Construction Amendment. Defendant Corporation presented Solution B as a temporary fix at the cost of an additional $300,000.00 to $500,000.00 to the Plaintiff Board.

49. Ultimately, the start of the in-person school year was delayed until Plaintiff Board could implement a temporary fix, without the help of Defendant Corporation. Defendant Corporation simply walked away from the Project and its own failure to provide "turnkey design and construction services" to Plaintiff Board as promised in the Initial Contract and Construction Amendment.

50. Having been abandoned by Defendant Corporation, and in need of a healthy and professional school setting, Plaintiff Board and its maintenance manager began searching for other companies to provide solutions for Defendant Corporation's failed HVAC system work at the Subject Schools.

51. Plaintiff Board has been forced to engage a new company to perform the work it originally hired Defendant Corporation to perform at a substantially similar cost, except, this time, there are no federal funds left to pay for the design and construction to render the HVAC systems at the Subject Schools fit for their intended purpose –heating, cooling, dehumidifying, and ventilating the Subject Schools.

52. After Plaintiff Board engaged a new company to perform the work it originally hired Defendant Corporation to perform, it was verified that Defendant Corporation did not obtain a single permit for the design and build work for the Project until after Plaintiff Board notified Defendant Corporation that there was a problem with the HVAC systems in the school.

53. Upon information and belief, even after permits were retroactively pulled by Defendant Corporation, in clear breach of the Initial Contract and Construction Amendment, the HVAC systems designed and built by Defendant Corporation pursuant to the Project failed inspection.

## First Claim for Relief
**Fraudulent Inducement**

54. Plaintiff Board repeats and realleges the allegations set forth in paragraphs 1 through 53 as if fully set forth herein.

55. Defendant Corporation made representations of material fact to Plaintiff Board regarding its ability to design and construct functioning "turnkey" HVAC systems at the Subject Schools.

56. Defendant Corporation represented to Plaintiff Board that it would maintain a standard of performance using at least such degree of care as is reasonably expected of professionals providing similar services to customers such as Plaintiff Board in the State of North Carolina.

57. Defendant Corporation represented to Plaintiff Board that it had the expertise, knowledge, and capability to design and construct HVAC systems that would function properly and meet the requirements of the North Carolina State Building Code.

58. Defendant Corporation represented to Plaintiff Board that its design and build services would be in compliance with all applicable federal, state, and local laws, rules, and regulations.

59. Defendant Corporation represented to Plaintiff Board that the design and build work performed pursuant to the Project would be free from defects.

60. Defendant Corporation represented to Plaintiff Board that the design and build work performed pursuant to the Project would include conceptual development and design development to ensure that the proposed construction work would interact with the existing equipment at the Subject Schools.

61. Defendant Corporation represented to Plaintiff Board that it would "secure necessary permits and use construction documents provided by Defendant Corporation" to perform the mechanical scope of work.

62. Defendant Corporation represented to Plaintiff Board that it would provide water balance and written reports.

63. Defendant Corporation represented to Plaintiff Board that it would provide equipment startup and validate the warranty.

64. Defendant Corporation represented to Plaintiff Board that it would perform equipment startup services to existing make-up air units and provide recommended service repairs as needed to recommission the equipment.

65. Defendant Corporation represented to Plaintiff Board that it would provide an airside test and balance and written report.

66. Defendant Corporation represented to Plaintiff Board that it would provide point to point commissioning.

67. Defendant Corporation knew that the representations outlined above were false and were made in reckless indifference to Plaintiff Board, its Subject Schools, and the Project.

68. Defendant Corporation's representations were false, as evidenced by the continued malfunction of the HVAC systems at the Subject Schools.

69. Defendant Corporation's representations were reasonably calculated to deceive Plaintiff Board, and did in fact deceive Plaintiff Board.

70. Defendant Corporation made these representations with the intent to induce Plaintiff Board to enter into the Initial Agreement and Construction Amendment and to pay substantial fees for the Project.

71. Plaintiff Board reasonably relied on Defendant Corporation's representations regarding its expertise and ability to complete the Project successfully.

72. Plaintiff Board was, in fact, deceived by Defendant Corporation's representations and induced to enter into the agreements and pay $1,598,866.00 for the Project which further resulted in approximately $700,000.00 in remediation services, and an additional $1,300,000.00 to an outside company to commission the HVAC systems that Defendant Corporation promised to commission in the Initial Contract and Construction Amendment.

73. To maintain a safe school environment, Plaintiff Board was left without any other recourse but to hire an attorney to file this subject action to address the damages caused by Defendant Corporation.

74. As a direct and proximate result of Defendant's fraudulent inducement, Plaintiff has suffered damages, including but not limited to a sum in excess of $3,600,000.00 plus attorneys' fees and expenses for the monies paid to Defendant Corporation; the issues caused by Defendant Corporation's failures that ultimately damaged the Subject Schools and the property contained

therein; and in response to the ongoing issues with the malfunctioning HVAC systems at the Subject Schools that must now be addressed by another company.

**<u>Second Claim for Relief</u>**
**Breach of Contract**

75. Plaintiff Board repeats and realleges the allegations set forth in paragraphs 1 through 74 as if fully set forth herein.

76. Plaintiff Board and Defendant Corporation entered into a valid and enforceable contract for the design and construction of HVAC systems at the Subject Schools as evidenced by the Initial Contract and Construction Amendment attached hereto as Exhibit 1 and Exhibit 2, collectively referred to as the "Contract."

77. Defendant Corporation breached the Contract by failing to perform its obligations as specified in the Contract, including specific actions, and inactions, described herein.

78. Defendant Corporation breached its Contract with Plaintiff Board by failing to design and design and construct functioning, specifically, "turnkey" HVAC systems at the Subject Schools.

79. Defendant Corporation breached its Contract with Plaintiff Board Defendant Corporation by failing to maintain a standard of performance using at least such degree of care as is reasonably expected of professionals providing similar services to customers such as Plaintiff Board in the State of North Carolina.

80. Defendant Corporation breached its Contract with Plaintiff Board by failing to design and construct HVAC systems that would function properly and meet the requirements of the North Carolina State Building Code.

81. Defendant Corporation breached its Contract with Plaintiff Board by failing to design and build HVAC systems at the Subject Schools in compliance with all applicable federal, state, and local laws, rules, and regulations.

82. Defendant Corporation breached its Contract with Plaintiff Board by failing to provide design and build work pursuant to the Project that was free from defects.

83. Defendant Corporation breached its Contract with Plaintiff Board by failing to provide the promised conceptual development, design development to ensure that the proposed construction work would interact with the existing equipment at the Subject Schools.

84. Defendant Corporation breached its Contract with Plaintiff Board by failing to "secure necessary permits and use construction documents provided by Defendant Corporation" to perform the mechanical scope of work.

85. Defendant Corporation breached its Contract with Plaintiff Board by failing to provide water balance and written reports.

86. Defendant Corporation breached its Contract with Plaintiff Board by failing to provide equipment startup and failing to validate the warranty.

87. Defendant Corporation breached its Contract with Plaintiff Board by failing to perform equipment startup services to existing make-up air units and by failing to provide recommended service repairs as needed to recommission the equipment, and, instead, walking away from the Project after collecting payment.

88. Defendant Corporation breached its Contract with Plaintiff Board by failing to provide an airside test and balance and written report.

89. Defendant Corporation breached its Contract with Plaintiff Board by failing to provide point to point commissioning.

90. Defendant Corporation breached the Contract by failing to design and construct functioning HVAC systems that comply with the North Carolina State Building Code and meet the ventilation requirements for educational spaces.

91. Defendant Corporation's breach of contract has caused Plaintiff Board to suffer damages, including but not limited to the $1,598,866.00 paid for non-functioning HVAC systems; approximately $700,000.00 in remediation services on top of the Contract price, caused by the non-functioning HVAC systems in the Subject Schools; and an additional $1,300,000.00 to an outside company to commission the HVAC systems that Defendant Corporation promised to commission in the Initial Contract and Construction Amendment, all as a result of Defendant Corporation's breach of contract.

**<u>Third Claim for Relief</u>**
**Quantum Meruit/Unjust Enrichment**
**(*in the alternative*)**

92. Plaintiff Board repeats and realleges the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

93. Plaintiff Board conferred a benefit upon Defendant Corporation by paying $1,598,866.00 for the design and construction of HVAC systems at the Subject Schools.

94. This benefit was not conferred officiously or gratuitously but was paid pursuant to the Initial Agreement and Construction Amendment for contracted services, as well as pursuant to in-person meetings and telephonic conferences.

95. The benefit conferred upon Defendant Corporation is measurable in the amount of $1,598,866.00.

96. Defendant Corporation consciously accepted the benefit by accepting payment by Plaintiff Board for the Project.

97. It would be inequitable for Defendant Corporation to retain the benefit without compensating Plaintiff Board, as the HVAC systems continue to malfunction and do not perform as needed.

**<u>Fourth Claim for Relief</u>**
**Unfair and Deceptive Trade Practices**
**(N.C. Gen. Stat.§ 75-1.1)**

98. Plaintiff Board repeats and realleges the allegations set forth in paragraphs 1 through 97 as if fully set forth herein.

99. Defendant Corporation engaged in commerce in the State of North Carolina in order to negotiate and execute the Contract, and in order to perform the Project, "turnkey design and construction services," at the Subject Schools in Edenton, North Carolina.

100. Defendant Corporation, in the course of negotiating the Contract with Plaintiff Board, and purporting to complete the, "turnkey design and construction services," at the Subject Schools in Edenton, North Carolina, engaged in unfair, deceptive, and misleading acts, as prohibited by the North Carolina Unfair and Deceptive Trade Practices Act, including the following:

a) Defendant Corporation represented to Plaintiff Board that it had ability to design and construct functioning "turnkey" HVAC systems at the Subject Schools when it did not.

b) Defendant Corporation represented to Plaintiff Board that it would maintain a standard of performance using at least such degree of care as is reasonably expected of professionals providing similar services to customers such as Plaintiff Board in the State of North Carolina.

c) Defendant Corporation represented to Plaintiff Board that it had the expertise, knowledge, and capability to design and construct HVAC systems that would function properly and meet the requirements of the North Carolina State Building Code.

d) Defendant Corporation represented to Plaintiff Board that its design and build services would be in compliance with all applicable federal, state, and local laws, rules, and regulations.

e) Defendant Corporation represented to Plaintiff Board that the design and build work performed pursuant to the Project would be free from defects.

f) Defendant Corporation represented to Plaintiff Board that the design and build work performed pursuant to the Project would include conceptual development, design development to ensure that the proposed construction work would interact with the existing equipment at the Subject Schools.

g) Defendant Corporation represented to Plaintiff Board that it would "secure necessary permits and use construction documents provided by Defendant Corporation" to perform the mechanical scope of work.

h) Defendant Corporation represented to Plaintiff Board that it would provide water balance and written reports.

i) Defendant Corporation represented to Plaintiff Board that it would provide equipment startup and validate the warranty.

j) Defendant Corporation represented to Plaintiff Board that it would perform equipment startup services to existing make-up air units and provide recommended service repairs as needed to recommission the equipment.

k) Defendant Corporation represented to Plaintiff Board that it would provide an airside test and balance and written report.

l) Defendant Corporation represented to Plaintiff Board that it would provide point to point commissioning.

101. Defendant Corporation engaged in unfair or deceptive acts or practices in violation of N.C.G.S.§ 75-1.1 as evidenced by Defendant Corporation's inability to follow through with any of the above representations and otherwise walking away from the Project when the HVAC systems it contracted to commission, and warranted to fix, were not functioning property.

102. Defendant Corporation's unfair or deceptive acts or practices occurred in or affected commerce, as they involved a commercial transaction for the design and construction of HVAC systems in the Subject Schools located in Edenton, North Carolina.

103. Defendant Corporation's unfair or deceptive acts or practices proximately caused injury to Plaintiff, including financial injury in the amount of in excess of $3,600,000.00 paid for non-functioning HVAC systems, subsequent remediation, and repair of the same HVAC systems.

104. As a result of Defendant Corporations' unfair or deceptive acts or practices, Plaintiff Board is entitled to treble damages and reasonable attorneys' fees pursuant to N.C.G.S.§ 75-16.

## Fifth Claim for Relief
## Breach of Express Warranty

105. Plaintiff Board repeats and realleges the allegations set forth in paragraphs 1 through 104 as if fully set forth herein.

106. Defendant Corporation made express warranties to Plaintiff Board regarding the design and functionality of the HVAC systems at the Subject Schools.

107. Defendant Corporation's Initial Agreement contained an entire section on Design/Builder's Performance, with several notable provisions including a standard of performed promised to Plaintiff Board:

> **Section 3.2. Standard of Performance.** Design/Builder represents and warrants that it has the professional skill, knowledge and experience necessary to perform and complete the Project in a timely and competent manner. Design/Builder shall perform, or cause to be performed, the Project using at least such degree of care as is reasonably expected of professionals providing similar services to Customers within the State of North Carolina in similar circumstances (and considering the Customer's goals and any financial or other constraints made known to Design/Builder before or after the Effective Date).

See Exhibit 1, Pg. 6, Section 3.2.

108. Defendant Contractor expressly warranted its work performed pursuant to the Initial Agreement and the contemplated construction amendment by expressly stating, in part, that Defendant Contractor:

> "...warrants that such work will confirm to the requirements of the Contract Documents and will be free from defects, except those inherent in the quality of the work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective."

See Exhibit 1, Pg. 7, Section 3.8.

109. Defendant Corporation expressly warranted in the Initial Agreement and Construction Amendment that the HVAC systems would function as intended to regulate air flow, temperature, and relative humidity in the Subject Schools.

110. Plaintiff Board relied on these express warranties when deciding to enter into the agreement with Defendant Corporation and pay the total fee of $1,598,866.00.

111. Defendant Corporation breached these express warranties by failing to deliver HVAC systems that function as warranted.

112. The HVAC systems at the Subject Schools continue to malfunction, demonstrating that they do not conform to the express warranties made by Defendant Corporation.

113. As a direct and proximate result of Defendant Corporation's breach of express warranties, Plaintiff has suffered damages in excess of $3,600,000.00 paid for non-functioning HVAC systems, subsequent remediation, and repair of the same HVAC systems, which are a consequence of Defendant Corporation's failures and reasonably foreseeable to Defendant Corporation.

**Sixth Claim for Relief**
**Breach of Implied Warranty**

114. Plaintiff Board repeats and realleges the allegations set forth in paragraphs 1 through 113 as if fully set forth herein.

115. Defendant Corporation, as a professional contractor, impliedly warranted that the HVAC systems it designed and built would be fit for their ordinary purpose.

116. The ordinary purpose of the HVAC systems is to regulate air flow, temperature, and relative humidity in the Subject Schools.

117. The HVAC systems designed and installed by Defendant Corporation are not fit for their ordinary purpose.

118. The HVAC systems at the Subject Schools continue to malfunction, demonstrating that they are not fit for their ordinary purpose of regulating air flow, temperature, and relative humidity.

119. As a direct and proximate result of Defendant Corporation's breach of implied warranty, Plaintiff Board has suffered damages in excess of $3,600,000.00 paid for non-functioning HVAC systems, subsequent remediation, and repair of the same HVAC systems, which are a consequence of Defendant Corporation's failures and reasonably foreseeable to Defendant Corporation.

**<u>Seventh Claim for Relief</u>**
**Negligence and Gross Negligence**

120. Plaintiff Board repeats and realleges the allegations set forth in paragraphs 1 through 119 as if fully set forth herein.

121. Defendant Corporation owed a duty of care to Plaintiff Board to properly design and construct the HVAC systems at the Subject Schools.

122. Defendant Corporation breached its duty of care by failing to properly design and construct the HVAC systems, resulting in malfunctioning systems that do not perform their intended function, including the following failures:

a) Defendant Corporation failed to hire, retain, and/or supervise the professionals able to design and construct functioning "turnkey" HVAC systems at the Subject Schools when it knew it was required for the HVAC systems to function.

b) Defendant Corporation failed to maintain standard of performance using at least such degree of care as is reasonably expected of professionals providing similar services to customers such as Plaintiff Board in the State of North Carolina.

c) Defendant Corporation failed to ensure that the HVAC systems would function properly and meet the requirements of the North Carolina State Building Code.

d) Defendant Corporation failed to provide design and build services in compliance with all applicable federal, state, and local laws, rules, and regulations.

e) Defendant Corporation failed to provide design and build work performed pursuant to the Project would be free from defects.

f) Defendant Corporation failed to perform conceptual and design development to ensure that the proposed construction work would interact with the existing equipment at the Subject Schools.

g) Defendant Corporation failed to "secure necessary permits and use construction documents provided by Defendant Corporation" to perform the mechanical scope of work.

h) Defendant Corporation failed to perform and provide water balance and written reports.

i) Defendant Corporation failed to provide equipment startup and validate the warranty.

j) Defendant Corporation neglected to perform equipment startup services to existing make-up air units and failed to provide recommended service repairs as needed to recommission the equipment.

k) Defendant Corporation failed to perform airside test and balance and neglected to provide a written report.

l) Defendant Corporation failed to provide and perform point to point commissioning.

123. Defendant Corporation's breach of the duty it owed to Plaintiff Board to provide "turnkey design and construction services" was the actual and proximate cause of Plaintiff Board's injuries.

124. Defendant Corporation's conduct in failing to deliver functioning HVAC systems, despite being paid $1,598,866.00, demonstrates a reckless disregard for its professional responsibilities and the safety and well-being of the students and staff at the Subject Schools.

125. As a direct and proximate result of Defendant Corporation's ordinary negligence and gross negligence, Plaintiff Board has suffered damages in excess of $3,600,000.00 paid for non-functioning HVAC systems, subsequent remediation, and repair of the same HVAC systems, which are a consequence of Defendant Corporation's failures and reasonably foreseeable to Defendant Corporation.

126. As a result of the acts and omissions of Defendant Corporation, that were in willful, wanton, and reckless disregard of Plaintiff Board's needs and motivations to complete the Project, Plaintiff Board has sustained such damages and losses that are tantamount to the award of punitive and compensatory damages in an amount to be proven at trial.

**<u>Eighth Claim for Relief</u>**
**Injury to Personal Property**

127. Plaintiff Board repeats and realleges the allegations set forth in paragraphs 1 through 126 as if fully set forth herein.

128. Plaintiff owns the HVAC systems installed in the Subject Schools, and the personal property located in the Subject Schools.

129. Defendant Corporation's actions caused damage to Plaintiff Board's HVAC systems and personal property located in the Subject Schools.

130. Defendant Corporation's failure to properly design and install the HVAC systems as warranted has resulted in damage to Plaintiff Board's property.

131. Defendant Corporation's actions were negligent in that Defendant Corporation failed to use reasonable care in the design and installation of the HVAC systems.

132. As a direct and proximate result of Defendant Corporation's negligent actions, Plaintiff Board has suffered damages in excess of $3,600,000.00 paid for non-functioning HVAC systems, subsequent remediation, and repair of the same HVAC systems, which are a consequence of Defendant Corporation's failures and reasonably foreseeable to Defendant Corporation.

**<u>Prayer for Relief</u>**

**WHEREFORE**, Plaintiff Board prays the Court as follows:

1. That Plaintiff Board have and recover monetary damages of Defendant Corporation as a result of Defendant Corporation's fraudulent inducement, in an amount to be proven at trial, in excess of $25,000.00, plus interest, costs and attorneys' fees as allowed by law;

2. That Plaintiff Board have and recover of Defendant Corporation a sum equal to the benefits due under the Initial Contract and the Construction Amendment, as well as consequential damages as pled herein and to be proven at trial, in an amount in excess of $25,000.00, plus interest, costs and attorneys' fees as allowed by law;

3. That Plaintiff Board have and recover damages from Defendant Corporation for breach of oral contract (*in the alternative*) and unjust enrichment as pled herein and to be proven at trial, in an amount exceeding $25,000.00, plus interest, costs and attorneys' fees as allowed by law;

4. That Plaintiff Board be awarded treble its contract and compensatory damages and extra expense as provided by N.C.G.S. §§ 75-1.1 and 75-16, or at Plaintiff Board's election, contract, compensatory, and punitive damages;

5. That Defendant Corporation be taxed with interest and the costs of this action, including Plaintiff Board's attorneys' fees as provided by the common law and the North Carolina General Statutes, including but not limited to Chapter 75 thereof;

6. That Plaintiff Board have and recover damages from Defendant Corporation for breach of warranties as pled herein and to be proven at trial, in an amount exceeding $25,000.00, plus interest, costs and attorneys' fees as allowed by law;

7. That Plaintiff Board have and recover damages from Defendant Corporation for its ordinary negligence as pled herein and to be proven at trial, in an amount exceeding $25,000.00, plus interest, costs and attorneys' fees as allowed by law;

8. That Plaintiff Board have and recover damages from Defendant Corporation for its gross negligence as pled herein and to be proven at trial, in an amount exceeding $25,000.00, plus interest, costs and attorneys' fees, and punitive damages as allowed by law;

9. That Plaintiff Board have and recover damages from Defendant Corporation for injury to personal property as pled herein and to be proven at trial, in an amount exceeding $25,000.00, plus interest, costs and attorneys' fees as allowed by law;

10. That the costs of this action be taxed against the Defendant Corporation;

11. That this matter be tried by jury; and

12. That the Plaintiff Board have such other and further relief to which it may be entitled and which this Court deems just and proper.

Respectfully submitted.

**[Signature Page to Follow]**

This the 7th day of March, 2025.

**HOWARD STALLINGS LAW FIRM**

/s/ Rebecca H. Ugolick
Rebecca H. Ugolick (Bar No. 48126)
Robert H. Jessup (Bar No. 42945)
Post Office Box 12347
Raleigh, North Carolina 27605
T: (919) 821-7700
F: (919) 821-7703
E: rugolick@howardstallings.com
rjessup@howardstallings.com
*Attorneys for Plaintiff Board*

**HIGH & CROWE, LLP**

/s/ William Hackney High, Jr.
William Hackney High, Jr. (Bar No. 17444)
Post Office Box 92
Edenton, North Carolina 27932
T: (252) 482-4422
F: (252) 482-4423
E: whigh@highandcrowe.com
*Attorneys for Plaintiff Board*

## *AGREEMENT FOR TURNKEY DESIGN AND CONSTRUCTION SERVICES*

This Agreement for Turnkey Design and Construction Services ("*Agreement*") is made effective as of **December 7th, 2021** ("*Effective Date*") by and between **Edenton-Chowan Public Schools a North Carolina K-12 School District** ("*Customer*"), and **Schneider Electric Buildings Americas, Inc.**, a Delaware corporation ("*Design/Builder*"). The Customer and Design/Builder may be referred to herein as the "*Parties*", collectively, and each, individually, as a "*Party*".

Subject to the terms and conditions hereof, the following exhibits and other documents are hereby incorporated in full herein (collectively with the Agreement and any other schedules, exhibits and/or documents expressly incorporated by reference into the Agreement, each as the same may be amended, modified or supplemented from time to time, the "*Contract Documents*"):

*Exhibits to the Agreement:*

| | |
|---|---|
| Exhibit A: | Scope of Design Work |
| Exhibit B: | Preliminary Design Schedule |
| Exhibit C: | Compensation for Design Services |
| Addendum X: | Construction Amendment |

*Exhibits to the Construction Amendment:*

| | |
|---|---|
| Exhibit D: | Scope of Construction Work |
| Exhibit E: | Preliminary Construction Schedule |
| Exhibit F: | Compensation for Construction Services |

### *RECITALS*

A. The Parties intend and agree, subject to all other provisions of this Agreement, that Design/Builder shall perform the design and construction services described under Articles 1 and 2 of this Agreement and the Exhibits referenced therein (the "*Project*").

B. Although the Parties intend to determine the precise scope of the construction services in conjunction with completion of the design services, the Parties intend that this Agreement shall be a "turnkey" agreement providing for Design/Builder to undertake both the design and construction phases of the Project.

C. Customer, being a "Governmental entity" within the meaning of North Carolina General Statute 143-128.1B, has fulfilled the requirements of North Carolina G.S. 143-128.1A in determining that a design-build method is appropriate for this Project and in selecting Design/Builder to perform the Project.

*NOW, THEREFORE,* in consideration of the foregoing and of the respective rights and obligations of the Parties set forth herein, the Parties hereby agree as follows:

## *ARTICLE 1*
## *DESIGN PHASE OF THE PROJECT*

***Section 1.1. Scope of Article 1.*** Except to the extent terms are defined in this Article 1 and used elsewhere in this Agreement and except as may be expressly provided in this Agreement, this Article 1 shall be deemed and construed to apply only to the design phase of the Project, as described in this Article 1("*Design Phase*"), which is to be performed prior to commencement of the construction phase of the Project, as described in Article 2 ("*Construction Phase*").

***Section 1.2. Scope of Design Work.*** The scope of the design services to be performed by Design/Builder under this Agreement is described in Exhibit A attached hereto (the "*Scope of Design Work*" or "*Design Work*"). At or prior to the Design Completion Meeting described in Exhibit A, Design/Builder shall provide Customer with a proposal setting forth a proposed Scope of Construction Work, a proposed Construction Fee, and any other information required to be included therein pursuant to Exhibit A (the "*Project Proposal*"). Unless the Project Proposal states otherwise, the pricing set forth in the Project Proposal will remain valid for sixty (60) days from the date of the Project Proposal (the "*Project Proposal Date*").

***Section 1.3. Design Schedule.*** The anticipated date of completion for the Design Phase and any applicable milestone dates are specified in the "*Preliminary Design Schedule*" attached hereto as Exhibit B.

***Section 1.4. Design Fee.*** The "Design Fee" shall mean the dollar amount set forth on Exhibit C attached hereto, which shall be payable to Design/Builder in accordance with Section 2.2.1(a).

***Section 1.5. Change In Scope of Work.*** The Customer may at any time request any change in the Scope of Design Work to be performed by Design/Builder pursuant to this Article 1. In response to any such request, Design/Builder shall provide to the Customer a written proposal that describes in reasonable detail: (i) the change; (ii) the impact of the change on the time required for performance of Design/Builder's obligations pursuant to this Article 1; and (iii) the impact of the change on the cost to the Customer for the performance of the Design Phase or for any other costs and fees payable under this Agreement. No proposal shall be valid or binding on the Parties unless, and except to the extent, incorporated into an amendment to this Agreement that has been duly approved, signed and delivered by both Parties (each, a "Change Order").

***Section 1.6. Customer Responsibilities.*** In order to facilitate the Design Phase and to assist Design/Builder in identifying and recommending appropriate construction services, Customer is responsible for providing Design/Builder with all such access, knowledge and history as may be relevant to Design/Builder's analysis and/or design, including, without limitation, with respect to Customer's facilities, systems, and equipment, as well as its accounting, maintenance, and operation practices. Customer is required to disclose all known or suspected deficiencies, defects and malfunctions of or affecting the facilities, systems, equipment and components thereof, as well as any site conditions that should be considered in planning and executing the construction services. Customer responsibilities are set forth in further detail on Exhibit A.

## *ARTICLE 2*
## *CONSTRUCTION PHASE OF THE PROJECT*

***Section 2.1. Scope of Article 2.*** Except to the extent terms are defined in this Article 2 and used elsewhere in this Agreement and except as may be expressly provided in this Agreement, this Article 2 shall be deemed and construed to apply only to the Construction Phase.

***Section 2.2. Commencement of Construction Phase.***

***Subsection 2.2.1. Option to Terminate Agreement or Execute Construction Amendment.*** Within sixty (60) days of the date of the Project Proposal Date, Customer may either (i) terminate this Agreement pursuant to Subsection 2.2.1(a) below, or (ii) execute an Amendment and Notice to Proceed with the Construction Phase in accordance with Subsection 2.2.1(b) below.

*(a)* ***Early Termination and Payment of Design Fee.*** Customer may terminate this Agreement for convenience during the Design Phase immediately upon providing Design/Builder with written notice of termination and payment in full for the Design Fee.

*(b)* **Execution of Construction Amendment.** If Customer wishes to proceed with the Construction Phase, the Parties shall finalize and execute an Amendment and Notice to Proceed with the Construction Phase (the "*Construction Amendment*"), a form of which is attached hereto as Addendum X. Upon execution, the Construction Amendment and all Exhibits thereto shall become part of this Agreement and shall replace the attached form as Addendum X to this Agreement. In such event, the Design Fee and any additional costs incurred by Design/Builder in the performance of the Design Work shall be rolled into and included in the Construction Fee, and such total amount shall be payable in accordance with the provisions of Section 2.5.

***Subsection 2.2.2. Notice to Proceed.*** Execution of the Construction Amendment shall serve as Customer's notice to Design/Builder to proceed with implementing the Construction Phase (the "*Notice to Proceed*").

***Subsection 2.2.3. Payment and Performance Bonds.*** Upon execution of the Construction Amendment, Design/Builder shall provide payment and performance bonds in compliance with Article 3 of Chapter 44A of the North Carolina General Statutes, each for an amount equal to 100% of the contract value of the Construction Phase. Notwithstanding any provision to the contrary herein, any performance bonds and payment bonds associated with the construction phase guarantee only the performance of the construction phase and the payment of any Subcontractors engaged by Design/Builder in connection therewith, respectively, and shall not be construed to guarantee the performance of any support or maintenance services, or any other guarantees, warranties or covenants with terms beyond one (1) year in duration from the Date of Substantial Completion of the Construction Phase.

***Section 2.3. Scope of Work.*** The scope of the construction services to be performed by Design/Builder pursuant to this Article 2 (the "*Scope of Construction Work*" or "*Construction Work*") shall be determined in conjunction with completion of the Design Phase and set forth on Exhibit D to the Construction Amendment. For the avoidance of doubt, notwithstanding the original scope of the Project as contemplated by Exhibit A, the Scope of Construction Work attached as Exhibit D to the Construction Amendment (as the same may be modified in accordance with this Agreement) shall represent the entirety of the intended and agreed upon scope for the Project.

***Section 2.4. Construction Schedule.***

***Subsection 2.4.1. Construction Time.*** The anticipated date of completion for the Construction Phase (the "*Completion Date*") and any applicable milestone dates shall be determined in conjunction with completion of the Design Phase and shall be set forth in the "*Preliminary Construction Schedule*" attached to the Construction Amendment as Exhibit E.

***Subsection 2.4.2. Delays.*** If Design/Builder's progress on the Project is at any point delayed due to changes in the requested scope of work, labor disputes, fire, unusual delay in deliveries, abnormally severe weather conditions, unavoidable casualties, epidemic or pandemic conditions, quarantine restrictions, and/or any other causes which are beyond the reasonable control of Design/Builder, then the Parties agree to execute a Change Order reflecting an equitable extension of time for Design/Builder's performance of the Project. In the event of any suspension or delay due to the acts or omissions of Customer or due to Customer's instructions to stop work for any reason, through no fault of Design/Builder: (i) all affected dates and milestones set forth in the Construction Schedule shall be extended to reflect such period of interruption; and (ii) the Construction Fee shall be equitably adjusted to cover Design/Builder's costs of demobilization, delay and remobilization related to such suspension or delay (provided, however, that Design/Builder shall cooperate with Customer, to the extent commercially reasonable, in mitigating such costs). If such suspension or delay continues for more than ninety (90) consecutive days, through no act or fault of Design/Builder, Design/Builder may terminate this Agreement and recover payment from Customer in accordance with Section 6.5 hereof.

***Subsection 2.4.3. Substantial Completion.*** "Substantial Completion" refers to and shall mean the point at which work is sufficiently implemented in accordance with the Contract Documents so as to be operational and fit for use by Customer, and fully complete except for minor items, adjustments and/or corrections ("punch list items"). Upon Substantial Completion of the work contemplated by the Scope of Construction Work (or any portion thereof, as appropriate), Design/Builder will issue to the Customer a "*Letter of Substantial Completion*" with respect to such Substantially Complete work (or portion thereof). Customer shall notify Design/Builder in writing within seven (7) days of Design/Builder's issuance of a Letter of Substantial Completion if Customer disputes the assertion that Design/Builder has achieved Substantial Completion of the applicable work, and such notice shall explain the basis for Customer's dispute and the portion of the applicable work to which it pertains. The Parties shall meet promptly following Customer's issuance of any such notice of dispute and shall in good faith attempt to resolve the dispute and to align on the path forward (i.e. punch list items, schedule or scope adjustments, etc.). The date on which Design/Builder issues any such Letter of Substantial Completion that is not timely disputed by Customer shall be the "Date of Substantial Completion" with respect to the applicable work.

***Subsection 2.4.4. Final Completion.*** "Final Completion" means that Substantial Completion of the full Scope of Construction Work has been achieved and all punch list items have been completed. Promptly following Design/Builder's delivery of a Substantial Completion Letter stating that Substantial Completion has been achieved with respect to the full Scope of Construction Work, the Parties shall schedule a walk-through to compile a list of punch list items that remain to be completed, if any. Design/Builder shall notify Customer when all such punch list items have been completed, and the Parties shall schedule a walk-through to confirm the same promptly thereafter. Upon confirming at the walk-through that all of the agreed punch list items have been completed, Customer shall execute a Notice of Final Completion confirming that Final Completion has been achieved and the Project has been accepted.



Case 2:25-cv-00020-D-KS Document 1-1 Filed 04/10/25 Page 27 of 54

*Section 2.5. Compensation, Invoicing and Payment.*

***Subsection 2.5.1. Construction Fee.*** The lump-sum compensation payable to Design/Builder for the Construction Phase (the "*Construction Fee*") shall be determined in conjunction with the completion of the Design Phase and shall be set forth on Exhibit F to the Construction Amendment. The Construction Fee is to be inclusive of, and not in addition to, the Design Fee.

***Subsection 2.5.2.*** **Schedule of Values.** Design/Builder will develop a schedule delineating the items to be completed pursuant to the Scope of Construction Work (the "*Schedule of Values*") and shall endeavor to provide such Schedule of Values to Customer within ten (10) days of the effective date of the Construction Amendment.

***Subsection 2.5.3. Project Mobilization Invoice and Payment.*** Within one (1) month of the effective date of the Construction Amendment, Customer shall make payment to Design/Builder for project mobilization expenses, including but not limited to engineering and development expenses, project start-up and mobilization expenses, expenses relating to procurement of equipment, material, and/or bonds, and other expenses incurred to date ("*Project Mobilization Payment*"), in an amount equal to ten percent (10%) of the Construction Fee.

***Subsection 2.5.4. Design/Builder Invoices.*** Beginning on the date that is two (2) months following the effective date of the Construction Amendment, Design/Builder shall provide monthly invoices to the Customer seeking payment for the work performed in the prior month (based on the percentage completion of items delineated on the Schedule of Values).

***Subsection 2.5.5. Payment.*** Payment of each invoice issued to Customer pursuant to Subsection 2.5.4 is due within thirty (30) days of the date of such invoice. If any payment is over thirty (30) days late from the due date stated on the invoice, Design/Builder may impose a penalty of one percent (1%) of the amount(s) owed for each month overdue and/or may terminate the Agreement in accordance with Section 6.4. If applicable, Customer's payments may be made from an escrow account set up in accordance with Customer's financing arrangement, in which case Customer shall be responsible for forwarding Design/Builder's invoices to the escrow agent and for authorizing and directing the escrow agent to timely release the invoiced amounts to Design/Builder.

***Subsection 2.5.6. Final Payment.*** Final payment shall not become due until Customer has signed the Notice of Final Completion, Design/Builder has delivered to Customer a conditional release of all liens arising out of this Agreement, covering all labor, materials, and equipment for which a lien could be filed, or a bond satisfactory to Customer to indemnify Customer against such lien. The making of final payment shall constitute a waiver of claims by Customer except those arising from (1) unresolved liens, security interests or encumbrances arising out of the Agreement, (2) Design/Builder's failure to perform the Construction Work in substantial compliance with the requirements of the Contract Documents, and (3) any warranties required by the Contract Documents.

***Section 2.6. Change Orders.*** Customer may at any time request any change in the Scope of Construction Work to be performed by Design/Builder pursuant to this Article 2. In response to any such request, Design/Builder shall provide to the Customer a written proposal that describes in reasonable detail: (i) the change; (ii) the impact of the change on the time required for performance of Design/Builder's obligations pursuant to this Article 2; and (iii) the impact of the change on the compensation to be paid by Customer to Design/Builder. No such change proposal shall be valid or binding on the Parties unless, and except to the extent, incorporated into a Change Order.

**Section 2.7. Performance Guarantees.** No efficiency or energy savings guarantees are being made by Design/Builder in connection with this Agreement.

## *ARTICLE 3*
## *DESIGN/BUILDER'S PERFORMANCE*

***Section 3.1. Scope of Article 3.*** Unless otherwise specified, the provisions of this Article 3 shall apply to both the Design Phase and Construction Phase.

***Section 3.2. Standard of Performance.*** Design/Builder represents and warrants that it has the professional skill, knowledge and experience necessary to perform and complete the Project in a timely and competent manner. Design/Builder shall perform, or cause to be performed, the Project using at least such degree of care as is reasonably expected of professionals providing similar services to Customers within the State of North Carolina in similar circumstances (and considering the Customer's goals and any financial or other constraints or parameters made known to Design/Builder before or after the Effective Date).

***Section 3.3 Licenses.*** Design/Builder represents and warrants that it currently has or shall timely obtain, and that it shall maintain, all licenses, permits, qualifications and approvals of whatever nature as are legally required to permit Design/Builder to perform the services required pursuant to this Agreement.

***Section 3.4. Regular Working Hours.*** Except as the Customer, in its sole discretion, may otherwise agree, Design/Builder shall perform such portions of the Project as are to occur at or in Customer's facilities (the "*Project Site(s)*") only: (i) on weekdays (i.e., any day, Monday through Friday, inclusive); and (ii) between the hours of 4 p.m. and 12 a.m. or when the site is unoccupied.

***Section 3.5. Employees and Subcontractors.***

***Subsection 3.5.1. Design/Builder's Subcontractors.*** Design/Builder may use one or more subcontractors (each, a "*Subcontractor*") to perform any portion(s) of the Project as Design/Builder may deem appropriate; provided, however, that Design/Builder shall remain ultimately responsible for the performance of its obligations under this Agreement. Design/Builder shall ensure that all of its Subcontractors have the skill, knowledge and experience necessary to perform the services assigned to them, and shall further ensure that each of its Subcontractors holds all licenses legally required for the practice of its profession.

***Subsection 3.5.2. Design/Builder's Employees.*** The employees of Design/Builder shall at all times be under Design/Builder's exclusive direction and control on the Project. Design/Builder shall pay all wages, salaries, and other amounts due to such personnel in connection with their performance of services under this Agreement, as required by law. Design/Builder shall be responsible for all reports and obligations respecting such personnel, including, but not limited to: social security taxes, federal and state income tax withholdings, unemployment insurance, and workers' compensation insurance. Design/Builder shall employ only competent workers for performance of the services and shall not employ any person who is unfit or unskilled in the work assigned to him or her.

*Subsection 3.5.3. Supervision by Design/Builder.* Design/Builder shall at all times enforce strict discipline and good order among its Subcontractors and employees performing any portion(s) of the services. At the Customer's request, Design/Builder shall remove from the Project and Project Site(s) any person, regardless of whether employed by the Design/Builder or any Subcontractor, who is not performing the services in a competent manner or who is a threat to the safety of persons or the Project, and Design/Builder shall not thereafter permit any such person to perform any of the services or to be present on or at the Project Site(s). In addition, during the course of the Construction Phase, Design/Builder shall have an experienced and competent superintendent (and any necessary assistants) present on the Project Site(s) to supervise the construction services and Design/Builder's employees and Subcontractors on the Project.

*Subsection 3.5.4. Prohibition Against Unlawful Discrimination.* Design/Builder represents and warrants that it is an equal opportunity employer and agrees that it shall not discriminate in violation of any applicable federal, state, or other law, rule or regulation, including, but not limited, to discrimination against any employee or applicant for employment on account of such person's race, religion, color, national origin, ancestry, sex, or age. Design/Builder shall apply such policy of non-discrimination in connection with all activities related to Design/Builder's employees and Subcontractors, including with respect to initial employment, promotion, demotion, transfer, recruitment or recruitment advertising, and layoff or termination.

*Section 3.6. Design/Builder's Compliance with Law.* Design/Builder and each of its Subcontractors shall perform the Project in compliance with all applicable federal, State of North Carolina and local laws, rules and regulations (collectively, "*Legal Requirements*"). Upon commencement of the Construction Phase, the Customer will coordinate and conduct, and Design/Builder and each of its Subcontractors will attend, any mandatory construction conference held for purposes of ensuring that Design/Builder and its Subcontractors are aware of the applicable Legal Requirements.

*Section 3.7. Reliance on Customer Information.* In performing its responsibilities under both the Design Phase and Construction Phase, Design/Builder shall be entitled to rely on the accuracy and completeness of any and all information provided to Design/Builder by the Customer, including without limitation the information required to be provided pursuant to Section 1.6 of this Agreement, except where it would be unreasonable to do so.

*Section 3.8. Design/Builder's Warranties and Disclaimers.* Design/Builder warrants to Customer that, for a period of one (1) year from the applicable Date of Substantial Completion of work covered by a Letter of Substantial Completion (the "*Warranty Period*"), the materials and equipment manufactured by Design/Builder will be of good quality and new unless the Contract Documents require or permit otherwise, and further warrants that the such work will conform to the requirements of the Contract Documents and will be free from defects, except for those inherent in the quality of the work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective. Design/Builder's warranty excludes remedy for damage or defect caused by abuse, alterations to the work not executed by or on behalf of Design/Builder, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. Design/Builder shall repair or replace defective material or equipment and re-perform work to correct any defect within the applicable Warranty Period. In the event warranty work by the Design/Builder is necessary, the Design/Builder shall provide an additional one-year warranty on the corrected work only from the date the corrected work is completed or the end of the initial warranty period, whichever is later. Design/Builder does not warrant products not manufactured by Design/Builder, but it will pass on to Customer any manufacturer's warranty to the extent permitted. THE FOREGOING WARRANTIES AND REMEDIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES AND REMEDIES, WHETHER STATUTORY, EXPRESS OR IMPLIED (INCLUDING ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OR TRADE).

## *ARTICLE 4*
## *INSURANCE*

***Section 4.1. Scope of Article 4.*** Unless otherwise specified, the provisions of this Article 4 shall apply to both the Design Phase and Construction Phase.

***Section 4.2. Required Insurance.*** Design/Builder shall, at its sole cost and expense, maintain in effect the following policies of insurance for the applicable period(s) set forth in Section 4.3:

(i) *Commercial General Liability Insurance.* A policy of commercial general liability insurance, written on an "occurrence" basis, with a limit of not less than five million dollars ($5,000,000) per occurrence ("*General Liability Policy*").

(ii) *Automobile Liability Insurance.* A policy of automobile liability insurance, written on an "occurrence" basis, with a combined single limit of not less than five million dollars ($5,000,000) per accident for bodily injury and property damage ("*Auto Liability Policy*"). The Auto Liability Policy must include coverage for owned, hired and non-owned automobiles.

(iii) *Workers' Compensation and Employer's Liability Insurance.* Workers' compensation insurance as required by North Carolina law, and employer's liability insurance, written on an "occurrence" basis, with a limit of not less than five million dollars ($5,000,000).

(iv) *Professional Liability Insurance.* Professional liability insurance, written on a claims made (and reported) basis, with a limit of not less than five million dollars ($5,000,000) per claim ("*Professional Liability Policy*").

***Section 4.3. Duration of Insurance.*** The insurance required pursuant to this Article 4 shall be procured by Design/Builder prior to Design/Builder's commencement of the Project and shall be maintained in effect by Design/Builder at least until the date that is one year following the earlier of the termination of this Agreement or the Date of Substantial Completion of the Project. Notwithstanding the foregoing, Design/Builder shall maintain the Professional Liability Policy in effect at least until the date that is three years following the earlier of the termination of this Agreement or the Date of Substantial Completion of the Project.

***Section 4.4. Insurer Rating Standards.*** The insurance policies required pursuant to this Article 4 must be issued by one or more insurers that are (i) licensed to do business in the State of North Carolina and (ii) have an A.M. Best Company rating of not less than "A-" and a financial size category of not less than "VII."

***Section 4.5. Additional Insureds.*** The Customer, members of the Customer's Governing Board (collectively, the "*Governing Board*"), and the Customer's other officers, employees, and agents (collectively, including the Governing Board, the "*Customer Agents*"), shall all be named as additional insureds on Design/Builder's General Liability Policy and Auto Liability Policy. The additional insured endorsements must be ISO Form CG 2010 12/19 and ISO Form CG 2037 12/19 combined or equivalent.

***Section 4.6. Waiver of Subrogation.*** Each of the General Liability Policy and the Auto Liability Policy shall provide a waiver of transfer of rights of recovery in favor of the Customer.

***Section 4.7. Design/Builder Insurance is Primary.*** The General Liability Policy and the Auto Liability Policy must be endorsed to provide that they are primary and non-contributory.

***Section 4.8. Premiums, Deductibles and Self-Insured Retentions.*** Design/Builder shall be solely responsible for paying any and all deductibles and self-insured retentions applicable to any of the insurance policies that Design/Builder is required to have in effect pursuant to this Article 4.

***Section 4.9. Evidence of Coverage.*** Prior to commencing the Design Phase, Design/Builder must provide to the Customer duly authorized and executed certificates of insurance evidencing that the insurance policies required to be maintained by Design/Builder pursuant to this Article 4 are in effect (each a "*Certificate of Insurance*") As applicable, the Certificates of Insurance must identify those who are additional insureds in accordance with this Article 4. Not less than thirty days prior to the expiration of any insurance policy that Design/Builder is required to maintain pursuant to this Article 4, Design/Builder must provide an updated Certificate of Insurance to the Customer evidencing the renewal of such policy.

***Section 4.10. Notice of Change in Policies.*** Design/Builder shall notify the Customer within thirty (30) days of its receipt of written notice from an applicable insurer that a policy required hereunder will expire without renewal or will be canceled, terminated, or materially reduced in coverage.

***Section 4.11. Review of Coverage.*** Customer's failure to identify any non-compliance by Design/Builder with the requirements of this Article 4 shall not be deemed or construed to relieve Design/Builder from any of its obligations hereunder.

***Section 4.12. Subcontractor Insurance.*** Design/Builder shall require that each of its Subcontractors comply with substantially the same requirements as are set forth in this Article 4 for Design/Builder, except to the extent the Customer has approved any different standards or requirements applicable to any particular Subcontractor.

## *ARTICLE 5*
## *INDEMNIFICATION AND LIABILITY*

***Section 5.1. Scope of Article 5.*** Unless otherwise specified, the provisions of this Article 5 shall apply to both the Design Phase and Construction Phase.

***Section 5.2. Indemnification of Customer.*** To the extent allowed under applicable law, Design/Builder shall indemnify, defend and hold harmless the Customer and the Customer Agents from and against any and all third-party claims, demands, actions, judgments, damages, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) to the extent caused by the negligence or misconduct of Design/Builder any Subcontractor, or any officers, employees, or agents of Design/Builder or any Subcontractor (collectively, not including Design/Builder, the "*Design/Builder Agents*") in connection with this Agreement.

***Section 5.3. Defense of Customer.*** Design/Builder shall control the defense and handling of any claims for which Design/Builder is required to indemnify Customer and/or the Customer Agents pursuant to Section 5.2, at Design/Builder's sole cost and expense, using qualified and appropriately experienced legal counsel selected and retained by Design/Builder. Design/Builder's obligations under Section 5.2 shall not apply to any claim that is settled or otherwise resolved by the Customer and/or any Customer Agent without Design/Builder's prior written consent.

***Section 5.4. Limitation on Design/Builder Obligations.*** Design/Builder shall not be obligated to indemnify or hold harmless Customer or any Customer Agent pursuant to this Article 5 to the extent any claim, demand, action, judgment, damage, loss, cost or expense results from the negligence or misconduct of the Customer or any of the Customer Agents. Design/Builder shall be reimbursed for any costs and expenses incurred in the defense or handling of any claim to the extent such claim is determined by a court or arbitrator of competent jurisdiction to be attributable to the negligence or misconduct of Customer or any Customer Agent.

***Section 5.5. [Intentionally Omitted].***

***Section 5.6. Notice; Cooperation.*** Each Party shall promptly notify the other Party of any claims, demands, actions, judgments, damages, losses, costs and/or expenses for which the other Party may be responsible pursuant to this Article 5. The Party seeking indemnification under this Article 5 shall fully cooperate with the indemnifying Party, at the indemnifying Party's cost and expense, to the extent reasonably necessary or appropriate in connection with the performance of the indemnifying Party's obligations pursuant to this Article 5.

***Section 5.7. Insurance Not a Limitation.*** The obligations of Design/Builder pursuant to this Article 5 shall not be deemed or construed to be conditioned upon, limited by or expanded by the existence of any insurance coverage maintained by a Party or other person or entity.

***Section 5.8. Subcontractor Indemnity.*** Design/Builder shall require each of its Subcontractors to comply with the requirements of this Article 5 related to indemnifying, holding harmless, and defending the Customer, except to the extent the Customer agrees in writing to apply a different set of standards or requirements to a particular Subcontractor.

***Section 5.9. Indemnification of Design/Builder.*** To the extent allowed under applicable law, the Customer shall indemnify and hold harmless Design/Builder and the Design/Builder Agents from and against any and all third-party claims, demands, actions, judgments, damages, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) caused by the negligence or willful misconduct of the Customer or any of the Customer Agents in connection with this Agreement.

***Section 5.10. Comparative Liability.*** Notwithstanding the foregoing provisions of this Article 5, in the event any claim, demand, action, judgment, damage, loss, cost or expense is to some extent within the scope of Design/Builder's obligations pursuant to Section 5.2 and to some extent within the scope of the Customer's obligations pursuant to Section 5.9, then the Parties shall be responsible and liable for such claim, demand, action, judgment, damage, loss, cost or expense on a comparative basis.

***Section 5.11. Limitations of Liability.*** NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT OR THE CONTRACT DOCUMENTS TO THE CONTRARY, IN NO EVENT SHALL EITHER PARTY, ITS OFFICERS, DIRECTORS, AFFILIATES OR EMPLOYEES BE LIABLE FOR ANY FORM OF INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOSS OF USE, LOSS OF PRODUCTION, LOSS OF PRODUCT, LOSS OF REVENUE, LOSS OF PROFITS OR LOSS OF DATA DAMAGES, WHETHER SUCH DAMAGES ARISE IN CONTRACT OR TORT AND IRRESPECTIVE OF FAULT, NEGLIGENCE OR STRICT LIABILITY OR WHETHER SUCH PARTY HAS BEEN ADVISED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR THE CONTRACT DOCUMENTS AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE MAXIMUM LIABILITY OF Design/Builder FOR DAMAGES UNDER THIS AGREEMENT AND THE CONTRACT DOCUMENTS SHALL NOT EXCEED THE AMOUNTS ACTUALLY PAID BY THE CUSTOMER FOR THE SERVICE(S) GIVING RISE TO THE CLAIM. THE PRECEDING SENTENCE SHALL NOT APPLY TO ANY CLAIM FOR BODILY INJURY, OR TO ANY OTHER CLAIM TO THE EXTENT OF DESIGN/BUILDER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

***Section 5.12. Survival of Obligations.*** With respect to acts, omissions or incidents occurring prior to completion of the Project and/or termination of this Agreement, the Parties' respective rights and obligations pursuant to this Article 5 shall survive completion of the Project and/or termination of this Agreement for the applicable statute of limitations.

## *ARTICLE 6*
## *SUSPENSION AND TERMINATION*

***Section 6.1. Scope of Article 6.*** Unless otherwise specified, the provisions of this Article 6 shall apply to both the Design Phase and Construction Phase.

***Section 6.2. Termination for Convenience by Customer.*** The Customer may terminate this Agreement in its entirety by providing thirty (30) days' written notice of termination to Design/Builder.

***Section 6.3. Suspension or Termination for Cause by Customer.*** If Design/Builder repeatedly or materially breaches this Agreement, the Customer has provided written notice to Design/Builder detailing the alleged breach, and within thirty (30) days of Design/Builder's receipt of such written notice Design/Builder has neither cured the alleged breach nor diligently commenced to cure such breach, Customer may suspend the Project or terminate this Agreement effective immediately upon the receipt of written notice by Design/Builder. Nothing in this Agreement shall be deemed or construed as a waiver by Design/Builder of any rights it may have with respect to a wrongful suspension or termination by the Customer.

***Section 6.4. Suspension or Termination for Cause by Design/Builder.*** If the Customer fails to make any payment(s) to Design/Builder as required in this Agreement or repeatedly or materially fails, refuses or neglects to fulfill any of its other obligations or responsibilities under this Agreement or the Contract Documents, Design/Builder may, after delivery of written notice and providing the Customer thirty (30) days to cure such failure, refusal or neglect, suspend the Project or terminate this Agreement. If Design/Builder suspends the Project pursuant to this Section, the Project schedule and any anticipated completion dates shall be adjusted accordingly. If Design/Builder terminates the Agreement pursuant to this Section, Design/Builder shall be entitled to recover payment from the Customer in accordance with Section 6.5 below. Nothing in this Agreement shall be deemed or construed as a waiver by the Customer of any rights it may have with respect to a wrongful suspension or termination by Design/Builder.

***Section 6.5. Compensation to Design/Builder Upon Termination.*** In the event of any termination other than a termination for cause by Customer pursuant to Section 6.3, the Customer shall compensate Design/Builder: (i) for such portion of the Project as has been completed prior to the effective date of termination; (ii) for services in progress by Design/Builder and any of its Subcontractors at such time, including any overhead and/or anticipated profit attributable to such work in progress, and (iii) for any costs and damages incurred by reason of the termination, including any proven loss with respect to subcontracts, materials, equipment, tools and machinery. In the event of a termination pursuant to Section 2.2.1(a), Customer shall pay the Design Fee to Design/Builder on the effective date of such termination.

***Section 6.6. Design/Builder to Provide Copies of Project Documents.*** Not later than sixty days following the effective date of a termination pursuant to this Article 6, Design/Builder shall provide to the Customer copies of all Project Documents (defined in Section 7.5).

***Section 6.7. Effect of Termination.*** Termination of this Agreement and/or any of the Contract Documents shall release Design/Builder of all remaining obligations under the Agreement and the Contract Documents as of the effective date of termination.

***Section 6.8. Survival of Obligations.*** The Parties' respective rights and obligations pursuant to Article 5 (subject to Section 5.12), this Article 6, and Article 7 shall survive termination of this Agreement.

## *ARTICLE 7*
## *MISCELLANEOUS*

***Section 7.1. Scope of Article 7.*** Unless otherwise specified, the provisions of this Article 7 shall apply to both the Design Phase and Construction Phase.

***Section 7.2. Relationship of the Parties.*** Design/Builder is, for any and all purposes of or related to this Agreement, an independent contractor to the Customer. In no event shall Design/Builder or any of its Subcontractors, or any officer, employee or agent of either, be deemed or construed to be an officer, employee or agent of the Customer on account of this Agreement. Nothing herein shall be deemed to establish a relationship of principal and agent between Design/Builder and the Customer, or any of their respective agents or employees, and neither this Agreement nor any of the Contract Documents may be construed as creating any form of legal association or arrangement that would impose liability upon one Party for the act or failure to act of the other Party.

***Section 7.3. Taxes.*** The Construction Fee excludes all present or future sales taxes, revenue or excise taxes, value-added taxes, import and export duties and any other taxes, surcharges or duties now existing or hereafter imposed by Government authorities upon equipment and/or services provided by Design/Builder. Design/Builder is required to impose taxes on orders and shall invoice the Customer for such taxes and/or fees according to state and local statute, unless the Customer timely furnishes Design/Builder with a properly completed exemption certificate acceptable to the authorities imposing the tax or fees

***Section 7.4. Project Records.*** Design/Builder shall keep and maintain all such books and records, to the extent exclusively related to the Project, as are necessary for proper administration and performance of the Project and/or as are required by law and/or this Agreement to be maintained ("*Project Records*"), including, but not limited to, plans and specifications, Change Orders, submittals, cut-sheets, requests for information, written notices, permits, testing and inspection reports, and safety records. To the extent required by law, Customer shall have the right to examine and audit the Project Records (during normal business hours and upon reasonable advanced notice) during the three-year period following final payment to Design/Builder pursuant to this Agreement, or for such other period of time as is required by law.

***Section 7.5. Ownership and Use of Documents.*** Any and all conceptual, preliminary, working, and final documents (both originals and reproductions), presentations, computations, analyses, and other documents, in whatever format or storage medium, that have been obtained or prepared for Customer by Design/Builder pursuant to this Agreement and that have been paid for by the Customer in accordance with this Agreement (each a "*Project Document*") shall be deemed and construed to be and remain the property of the Customer. Assuming the Customer has paid in full for the Project Documents, the Customer shall have the unconditional right to use the Project Documents, for their intended purposes and, at the Customer's sole discretion, for any other purpose, with no additional compensation due to Design/Builder. Except as expressly agreed in writing, the Customer shall not be required to employ Design/Builder in connection with any future use of the Project Documents. However, notwithstanding anything to the contrary, the Customer acknowledges and agrees that the Project Documents are prepared with the expectation and intent that the Construction Phase is to be performed and completed by or on behalf Design/Builder; in the event Customer terminates this Agreement pursuant to Section 2.2.1(a) or 6.2, Customer acknowledges and agrees that the Project Documents are not intended to be, and shall not be, relied upon by the Customer or any third party in performing or completing any aspect of the Project. The Customer shall indemnify and hold Design/Builder harmless for any liabilities caused by Customer's use of the Project Documents other than in connection with Design/Builder's completion of the Project.

***Section 7.6. Intellectual Property Rights.*** Nothing in this Agreement shall be deemed or construed to result in the Customer acquiring any interest or rights in any intellectual property owned, possessed or developed by Design/Builder or any third parties ("Design/Builder Intellectual Property"), including without limitation any Design/Builder Intellectual Property in or underlying the Project Documents. However, Design/Builder hereby grants Customer a perpetual, paid-up, worldwide license to make use of Design/Builder Intellectual Property to the extent that such Design/Builder Intellectual Property is necessary for the proper use, operation and/or maintenance of the Project Documents and/or any other products, services or deliverables provided by Design/Builder pursuant to this Agreement. To the extent provided pursuant to this Agreement, Design/Builder shall indemnify, defend and hold harmless the Customer and the Customer Agents for any infringement of third-party intellectual property rights caused by Design/Builder or any of its Subcontractors in connection with this Agreement.

***Section 7.7. Force Majeure.*** Notwithstanding anything to the contrary, Design/Builder shall not be held responsible (whether by actual or liquidated damages, termination for default, or otherwise) for any delay or non-performance that is caused by circumstances beyond Design/Builder's reasonable control (such as, for example, acts of God or the public enemy, acts of government, fires, floods, epidemics and/or pandemics, quarantine restrictions, strikes, unusually severe weather, unusually severe shortages in the available supply of and/or unusually severe increases in the cost of materials or equipment needed for performance of the work, and delays of common carriers). In the event that Design/Builder's performance hereunder is impacted by such force majeure circumstances, then upon Design/Builder's reasonable request (with appropriate supporting documentation), the Parties shall execute a Change Order reflecting such equitable changes to this Agreement as may be necessary or appropriate under the circumstances.

***Section 7.8. Export Control.*** The products, software, services, information, other deliverables and/or the technologies embedded therein (hereinafter referred to as "*Deliverables*") provided by Design/Builder under this Agreement contain or may contain components and/or technologies from the United States of America ("*US*"), the European Union ("*EU*") and/or other nations. Customer acknowledges and agrees that the supply, assignment and/or usage of Deliverables under this Agreement shall fully comply with applicable US, EU and other national and international export control laws and/or regulations. Unless any applicable export licenses have been obtained from the relevant authority and the Design/Builder has approved, the Deliverables shall not (i) be exported or re-exported to any destination or party (including without limitation to any individual, group or legal entity) restricted by the applicable export control laws and/or regulations; or (ii) be used for those purposes and fields restricted by the applicable export control laws and/or regulations. Customer also agrees that the Deliverables will not be used either directly or indirectly in any rocket systems, unmanned air vehicles, nuclear weapons delivery systems, and/or in any design, development, production or use of or related to weapons (which may include, without limitation, chemical, biological or nuclear weapons). If any necessary or advisable licenses, authorizations or approvals are not obtained, whether arising from inaction by any relevant government authority or otherwise, or if any such licenses, authorizations or approvals are denied or revoked, or if the applicable export control laws and/or regulations would prohibit Design/Builder from fulfilling any order, or would in Design/Builder's judgment otherwise expose Design/Builder to a risk of liability under the applicable export control laws and/or regulations if it fulfilled the order, Design/Builder shall be excused from all affected obligations under such order and/or this Agreement.

***Section 7.9. Ethics and Compliance with Laws.*** Each Party shall comply in all respects with all applicable legal requirements governing the duties, obligations, and business practices of that Party. Neither Party shall take any action in violation of any applicable legal requirement that could result in liability being imposed on the other Party. In the event Customer has concerns related to ethics, compliance or Design/Builder's Principles of Responsibility, and/or any potential violations of these policies, Customer is welcome to make use of Design/Builder's GreenLine. The GreenLine is Design/Builder's global helpline for external stakeholders. It is a confidential channel through which Customers can ask questions and raise concerns.

Reports can be made using the following link:
https://secure.ethicspoint.eu/domain/media/en/gui/104677/index.html

***Section 7.10. Cybersecurity.***

**Section 7.10.1.** ***Customer's Obligations for Its Systems.*** Customer is solely responsible for the implementation and maintenance of a comprehensive security program ("*Security Program*") that contains reasonable and appropriate security measures and safeguards to protect its computer network, systems, machines, and data (collectively, "*Systems*"), including those Systems on which it runs the Deliverables provided by Design/Builder, against Cyber Threats. "*Cyber Threat*" means any circumstance or event with the potential to adversely impact, compromise, damage, or disrupt Customer's Systems or that may result in any unauthorized access, acquisition, loss, misuse, destruction, disclosure, and/or modification of Customer's Systems, including through malware, hacking, or similar attacks. Without limiting the foregoing, Customer shall at a minimum:

(i) have qualified and experienced personnel with appropriate expertise in cybersecurity maintain Customer's Security Program, and have such personnel regularly monitor cyber intelligence feeds and security advisories applicable to Customer's Systems or Customer's industry;

(ii) promptly update or patch its Systems or implement other appropriate measures based on any reported Cyber Threats and in compliance with any security notifications or bulletins, whether publicly disclosed on Design/Builder's security notification webpage at https://www.se.com/ww/en/work/support/cybersecurity/security-notifications.jsp or otherwise provided to Customer;

(iii) regularly monitor its Systems for possible Cyber Threats;

(iv) regularly conduct vulnerability scanning, penetration testing, intrusion scanning, and other cybersecurity testing on its Systems; and

(v) meet the recommendations of Design/Builder's Recommended Cybersecurity Best Practices, available at https://www.se.com/us/en/download/document/7EN52-0390/, as may be updated by Design/Builder from time to time, and then-current industry standards.

***Section 7.10.2. Customer's Use of the Deliverables.*** Design/Builder may release Updates and Patches for its Deliverables from time to time. Customer shall promptly install any Updates and Patches for such Deliverables as soon as they are available in accordance with Design/Builder's installation instructions and using the latest version of the Deliverables, where applicable. An "*Update*" means any software that contains a correction of errors in a Deliverable and/or minor enhancements or improvements for a Deliverable, but does not contain significant new features. A "*Patch*" is an Update that fixes a vulnerability in a Deliverable. Customer understands that failing to promptly and properly install Updates or Patches for the Deliverables may result in the Deliverables or Customer's Systems becoming vulnerable to certain Cyber Threats or result in impaired functionality, and Design/Builder shall not be liable or responsible for any losses or damages that may result.

***Section 7.10.3. Identification of Cyber Threats.*** If Customer identifies or otherwise becomes aware of any vulnerabilities or other Cyber Threats relating to the Deliverables for which Design/Builder has not released a Patch, Customer shall promptly notify Design/Builder of such vulnerability or other Cyber Threat(s) via the Design/Builder Report a Vulnerability page (https://www.se.com/ww/en/work/support/cybersecurity/report-a-vulnerability.jsp#Customers) and further provide Design/Builder with any reasonably requested information relating to such vulnerability (collectively, "*Feedback*"). Design/Builder shall have a non-exclusive, perpetual and irrevocable right to use, display, reproduce, modify, and distribute the Feedback (including any confidential information or intellectual property contained therein) in whole or part, including to analyze and fix the vulnerability, to create Patches or Updates for its customers, and to otherwise modify its Deliverables, in any manner without restrictions, and without any obligation of attribution or compensation to Customer; provided, however, Design/Builder shall not publicly

disclose Customer's name in connection with such use or the Feedback (unless Customer consents otherwise). By submitting Feedback, Customer represents and warrants to Design/Builder that Customer has all necessary rights in and to such Feedback and all information it contains, including to grant the rights to Design/Builder described herein, and that such Feedback does not infringe any proprietary or other rights of third parties or contain any unlawful information.

***Section 7.11. Notices.***

***Subsection 7.11.1. General Requirements.*** Any and all demands and notices required or permitted to be given pursuant to this Agreement (each a "*Notice*") must be in writing and must be given or served in accordance with this Section 7.11.

***Subsection 7.11.2. Methods of Delivery.*** Each Notice must be sent via: (i) personal delivery, with the name and signature of the recipient obtained upon delivery; (ii) registered or certified United States mail, with postage prepaid and return receipt requested; (iii) FedEx, U.P.S. or other reliable, private delivery service, with the name and signature of the recipient obtained upon delivery; or (iv) electronic mail, with the reference line indicating that it is a "Notice Pursuant to Agreement for Turnkey Design and Construction Services", with confirmation of transmission from the sender's machine or device retained in the sender's files (a copy of which shall be provided to the recipient upon request), and with the original Notice deposited for delivery pursuant to clauses (ii) or (iii) above within 12 hours after electronic transmission. Neither Party may unreasonably refuse to accept delivery of any Notice in an attempt to avoid the giving or service of the Notice, and any such refusal by a Party shall be deemed and construed as a material breach of such Party's obligations pursuant to this Agreement.

***Subsection 7.11.3. Effect of Receipt.*** A Notice shall be deemed given or served only upon actual receipt by the addressee. In the case of electronic mail, "actual receipt" must be confirmed by a "Read Receipt" or other confirmation of receipt by the recipient. Notwithstanding the foregoing, if any Notice (including, without limitation, any Notice sent by electronic mail) is delivered after 4:00 p.m. on any weekday, on a weekend (Saturday or Sunday), on any federal or State of North Carolina holiday, or on any Customer furlough day mandated by the State of North Carolina or the Governing Board, the Notice shall be deemed to have been given or served as of 9:00a.m. on the next business day.

***Subsection 7.11.4. Applicability of Notice Requirements.*** The requirements of this Section 7.11 shall not be deemed or construed to apply to: (i) communications between the Customer and/or Design/Builder necessary for day-to-day administration of this Agreement or performance of the Project; or (ii) service of process in accordance with any applicable law or court rule.

***Subsection 7.11.5. Contact Information; Changes.*** Notice must be addressed and delivered to a Party at the address set forth below, with attention to such Party's representative named below. A Party must give Notice, in accordance with this Section 7.11, of each change in such Party's address, person to whom attention should be directed, or e-mail address. If any such information applicable to a Party changes and such Party does not give Notice of such change, any subsequent Notices addressed and delivered based on such Party's prior contact information shall be deemed and construed to have been properly given or served in accordance with this Section 7.11, regardless of whether "actual receipt" has occurred.

Customer:
Edenton-Chowan Public Schools
800 N. Oakum St.
Edenton, NC 27932
Attention: Chris Brabble

Design/Builder:
Schneider Electric Buildings Americas Inc.
1650 West Crosby Rd
Carrollton, TX 75006
Attention: Tammy Fulop

***Section 7.12. Governing Law.*** This Agreement shall be governed by and interpreted in accordance with North Carolina law, regardless of any conflict-of-laws provisions applicable in North Carolina or any other jurisdiction.

***Section 7.13.[Intentionally Omitted.].***

***Section 7.14. Interpretation of Agreement.***

***Subsection 7.14.1. Fair and Reasonable Interpretations.*** Prior to execution and delivery of this Agreement, each Party has received, or had unqualified opportunities to receive, independent legal advice from its legal counsel with respect to the advisability of executing this Agreement and the meaning of the provisions herein. Therefore, the provisions of this Agreement shall be construed based on their fair and reasonable meaning, and not for or against any Party based on whether such Party or its legal counsel was primarily responsible for drafting this Agreement or any particular provision herein.

***Subsection 7.14.2. Headings and Captions.*** The headings and captions set forth in this Agreement are for the convenience of the reader only and shall not be deemed or construed to establish, define or limit the meaning of any Article, Section or other provision herein.

***Subsection 7.14.3. Correct Legal Requirements Deemed Included.*** Each and every provision required by any applicable law to be included in this Agreement is hereby deemed to be so included, and this Agreement shall be construed and enforced as if all such provisions are so included. If, for any reason, any provision required by any applicable law is not expressly included herein, or is not correctly included herein, then, upon request of either the Customer or Design/Builder, the Parties shall amend this Agreement to include or incorporate, or to correctly include or incorporate, such provision.

Without limiting the generality of the foregoing, to the extent Customer is funding the Project with a Federal award, the "*Contract Provisions for Non-Federal Entity Contracts Under Federal Awards*" set forth under Appendix II to Part 200 of Title 2 of the Code of Federal Regulations are hereby incorporated in this Agreement as if set forth in full herein.

***Section 7.15. Severability.*** If any provision of this Agreement is determined to be invalid, illegal, or unenforceable as written, such provision shall be construed consistent with and to the fullest extent permitted under applicable law, and any such determination shall not affect or impair the validity, legality and enforceability of the remaining provisions.

***Section 7.16. Entire Agreement.*** This Agreement, together with the Contract Documents, constitutes the entire understanding and agreement between the Parties pertaining to the performance by Design/Builder of the services required by this Agreement, and all prior and contemporaneous agreements, representations and understandings of the Parties relating to such subject matter, whether oral or written, are hereby superseded and replaced.

***Section 7.17. Modifications of Agreement.*** This Agreement may be amended or otherwise modified only by means of a written agreement duly approved, signed, and delivered by both Parties.

***Section 7.18. Waiver.*** A waiver by a Party of any provision of this Agreement shall be binding only if the waiver is set forth in writing and has been duly approved and signed by the waiving Party. Unless so specified in the written waiver, a waiver by a Party of any provision of this Agreement shall not constitute a waiver of any other provision(s) herein, similar or not, and shall not be construed as a continuing waiver. Except as waived in accordance with this Section, a Party's failure to require performance of any requirement of this Agreement shall not, in any manner, affect the Party's right to enforce the same or any other provision of this Agreement at a later time.

***Section 7.19. Successors and Assigns.*** Neither Party may assign this Agreement without the express written consent of the other Party, and any attempt to do so shall be null and void. Subject to the foregoing, this Agreement shall inure to the benefit of, and be binding on, the Parties' authorized successors and assigns.

***Section 7.20. Third-Party Beneficiaries.*** The Parties have entered into this Agreement solely for their own purposes, and this Agreement shall not be deemed or construed to: (i) benefit any third party; (ii) create any right for any third party; or (iii) except as provided by law, provide a basis for any claim, demand, action or other proceeding by any third party.

***Section 7.21. Agreement is Public Record.*** Subject to any legally permissible exceptions, this Agreement is a public record which the Customer may disclose in accordance with North Carolina law.

***Section 7.22. Execution of Agreement.***

***Section 7.22.1. Counterparts.*** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall constitute one and the same instrument. Signature pages may be detached from counterpart originals and combined to physically form one or more copies of this Agreement having original signatures of both Parties.

***Section 7.22.2. Due Authority of Signatories.*** Each person signing this Agreement represents and warrants that he or she has been duly authorized by appropriate action of the Party he or she represents to *execute*, and thereby bind such Party *to*, this Agreement.

*In Witness Whereof,* the Parties have executed this Agreement as evidenced by the signatures of their authorized representatives below.

| ***Edenton-Chowan Public Schools*** | ***Schneider Electric Buildings Americas, Inc.*** |
| --- | --- |
| By: [signature] | By: ______________________ |
| Print Name: Eugene Jordan | Print Name: ______________________ |
| Print Title: Board of Education Chair | Print Title: ______________________ |
| Date Signed: 12/7/21 | Date Signed: ______________________ |
| | Fed. Tax ID No: ______________________ |

***Exhibit A***
***Scope of Work - Design Phase of the Project***

## 1. ***Responsibilities***

Customer Will:

A. Provide Design/Builder with all such access, knowledge and history as may be relevant to Design/Builder's analysis and/or design, including, without limitation:

(i) access to Customer's facilities, systems and equipment, including remote network access, as necessary or appropriate to facilitate Design/Builder's analysis and design (i.e. enabling Design/Builder to take equipment inventory, determine operating schedules, evaluate known operational deficiencies, etc.);

(ii) access to key personnel to discuss operating requirements, maintenance practices, and other information relevant to Design/Builder's analysis;

(iii) information relating to any and all known or suspected deficiencies, defects and malfunctions of or affecting the facilities, systems, equipment and components thereof;

(iv) information relating to any site conditions that should be considered in planning and executing the construction services; and

(v) access to copies or loans of such documentation as may be relevant to Design/Builder's analysis, including, as applicable and without limitation, facility plans, equipment lists, and/or utility invoices.

B. Meet with Design/Builder to establish project criteria and make project decisions in a timely manner.

C. Promptly inform Design/Builder if at any point Customer becomes aware of any portions of scope that will not be included or funding that will not be available for final project implementation.

Design/Builder Will Provide Customer with the Following:

A. Proposed Scope of Construction Work

a. Bi-Polar Ionization at White Oak ES, D.F. Walker ES, & Chowan MS

b. HVAC & Cooling Tower Renovations at White Oak ES & D.F. Walker ES

B. A Description of How the Proposed Work Would Interact with the Existing Equipment in the Facilities

C. A Completed Construction Amendment Contract

D. Proposed Preliminary Construction Schedule

E. Proposed lump-sum Construction Fee

### 2. *Phases of Design*

The Design Scope of Work shall consist of two phases: Conceptual Development (Up to Mid-Term Design Meeting) and Design Development (up to Design Completion Meeting).

A. Conceptual Development (Project Scoping)

(i) At the Mid-Term Design Meeting:

- Conceptual designs will be reviewed by the Customer and feedback will be incorporated into the final design.

B. Design Development (Design Completion)

(i) At the Design Completion Meeting, which will mark the end of the Design Phase, Design/Builder shall present to Customer a Project Proposal setting forth:

- A proposed final Scope of Construction Work;
- A proposed Preliminary Construction Schedule;
- A proposed Construction Fee.

### 3. *Facilities Included*

The Design Services will be performed in Customer's following facilities. Any additional facilities to be added in the future must be by mutual agreement between Customer and Design/Builder:

| Facilities |
|---|
| White Oak Elementary School |
| D.F. Walker Elementary School |
| Chowan Middle School |

## *Exhibit B*

### *Preliminary Schedule – Design Phase of the Project*

Following is the preliminary schedule for the Design Phase. A firm development schedule will be developed and presented for acceptance by Customer once Design/Builder has discussed development requirements and timing with Customer's partners.

| Item | Target Schedule |
|---|---|
| Project Kickoff Meeting | 12/8/21 |
| Field Investigations | 12/8/21 – 1/7/22 |
| Scoping & Cost Development | 1/7/22 – 2/11/22 |
| Deliver Final Proposal | Week of 2/14/22 |
| Board Approval | March Board Meeting |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

***EXHIBIT C***
***Design Fee***

**Design Fee:**

The "Design Fee" shall be: $67,500.

## *AMENDMENT AND NOTICE TO PROCEED WITH THE CONSTRUCTION PHASE PURSUANT TO THAT CERTAIN AGREEMENT FOR TURNKEY DESIGN AND CONSTRUCTION SERVICES*

This Amendment and Notice to Proceed with the Construction Phase (this "*Construction Amendment*") is made effective as of **March 1st, 2022** (the "*Construction Amendment Effective Date*") by and between the **Edenton-Chowan Public Schools a North Carolina K-12 School District** ("*Customer*"), and **Schneider Electric Buildings Americas, Inc.**, a Delaware corporation ("*Design/Builder*"). The Customer and Design/Builder may be referred to herein as the "*Parties*", collectively, and each, individually, as a "*Party*".

### *RECITALS*

A. The Parties previously entered into that certain Agreement for Turnkey Design and Construction Services dated **December 7th, 2021** (the "Agreement"), whereby the Customer engaged Design/Builder to perform both the design and construction phases of the "Project" described therein.

B. Pursuant to Subsection 2.2.1 of the Agreement, the Parties are executing this Construction Amendment in order to finalize certain details of the Construction Phase.

C. Any capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Agreement. The Agreement, as amended by this Construction Amendment, shall be referred to herein as the "*Amended Agreement*".

*NOW, THEREFORE,* in consideration of the foregoing and of the respective rights and obligations of the Parties set forth in the Amended Agreement, the Parties hereby agree as follows:

### *I. CONSTRUCTION AMENDMENT*

The following provisions shall modify, supplement, and become part of the Agreement, as applicable:

***Section 1. Addendum X.*** In accordance with Subsection 2.2.1(b) of the Agreement, this Construction Amendment shall become part of the Agreement as Addendum X thereto and shall replace the prior form of Addendum X in its entirety.

***Section 2. Scope of Construction Services.*** In accordance with Section 2.3 of the Agreement, the Scope of Construction Services to be performed by Design/Builder in connection with the Construction Phase is set forth on Exhibit D, attached hereto.

***Section 3. Construction Time.*** The Preliminary Construction Schedule, setting forth the Completion Date for the Construction Phase and any applicable milestone dates, is attached hereto as Exhibit E.

***Section 4. Construction Fee.*** The lump-sum Construction Fee payable to Design/Builder for the Construction Phase is set forth on Exhibit F, attached hereto. The Construction Fee is inclusive of the Design Fee (such Design Fee having been rolled into the lump-sum Construction Fee pursuant to Subsection 1.4.2 of the Agreement).

***Section 5. Notice to Proceed.*** In accordance with Subsection 2.2.2 of the Agreement, the execution of this Construction Amendment serves as Customer's Notice to Proceed with the Construction Phase. Effective as of the Construction Amendment Effective Date, Design/Builder shall commence to perform the construction services in accordance with the Preliminary Construction Schedule.

**Section 6. No Performance Guarantee.** Notwithstanding anything to the contrary, Design/Builder is not providing any energy or efficiency savings guarantees in connection with the Project or the Agreement.

**Section 7. Facility Access.** The following provision is hereby added to the Agreement as a new Section 3.9:

> "**Section 3.9. Facility Access.** Customer (i) shall provide a lock box at the Project Site containing spare keys to all areas of the Project Site that may need to be accessed by Design/Builder in connection with the performance of work under this Agreement, and (ii) shall provide the Design/Builder with the access code to such lock box. Customer shall maintain, in Customer's possession, copies of all keys provided to Design/Builder, and Customer shall not share the access code to the lock box or the keys housed therein with any other contractors, vendors or third parties. Design/Builder shall be responsible for returning the keys to the lock box at the end of each work day and shall document Design/Builder's access to the facility on a log to be kept in the lock box. Design/Builder shall not give out the access code to the lock box, nor shall Design/Builder give out the keys themselves, except to employees and/or agents of Design/Builder in connection with the performance of work under this Agreement. Design/Builder will be liable for damages, if any, that result from a failure by Design Builder (or its employees or agents) to comply with its obligations under this Section; however, Design/Builder will not be liable for damages, if any, to the extent resulting from a failure by Customer (or its employees or agents) to comply with Customer's obligations under this Section."

**Section 8. Umbrella/Excess Liability Insurance.** The following provision is hereby added to the Agreement as a new Subsection 4.2(v):

> "*Umbrella/Excess Liability Insurance.* A policy of umbrella/excess liability insurance, written on an "occurrence" basis, with a limit of not less than five million dollars ($5,000,000) per occurrence, which such policy shall follow form of the underlying coverages with respect to additional insured endorsements."

## *II. GENERAL PROVISIONS*

The following provisions shall govern the interpretation and enforcement of this Construction Amendment:

***Section 1. No Other Modifications.*** The provisions of Part I of this Construction Amendment, together with the Exhibits referenced therein, shall be construed as the sole extent of the modifications beingmade to the Agreement pursuant to this Construction Amendment. Except as hereby modified, the Agreementshall continue in full force and effect in accordance with its provisions.

***Section 2. Governing Law.*** This Construction Amendment shall be governed by and interpreted in accordance with North Carolina law, regardless of any conflict-of-laws provisions applicable in North Carolina or any other jurisdiction.

***Section 3. Severability.*** If any provision of this Construction Amendment is determined to be invalid, illegal, or unenforceable as written, such provision shall be construed consistent with and to the fullest extent permitted under applicable law, and any such determination shall not affect or impair the validity, legality and enforceability of the remaining provisions.

***Section 4. Entire Agreement.*** The Amended Agreement, together with the Contract Documents, constitutes the entire understanding and agreement between the Parties pertaining to the performance by Design/Builder of the services required by the Amended Agreement.

***Section 5. Counterparts.*** This Construction Amendment may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, taken together, shall constitute one and the same instrument. Signature pages may be detached from counterpart originals and combined to

physically form one or more copies of this Construction Amendment having original signatures of both Parties.

***Section 6. Due Authority of Signatories.*** Each person signing this Construction Amendment represents and warrants that he or she has been duly authorized by appropriate action of the Party he or she represents to execute, and thereby bind such Party to, this Construction Amendment.

*In Witness Whereof*, The Parties have executed this Construction Amendment as evidenced by the signatures of their authorized representatives below.

| ***Edenton-Chowan Public Schools*** | ***Schneider Electric Buildings Americas, Inc.*** |
| --- | --- |
| By: [signature] | By: [signature] |
| Print Name: Eugene Jordan | Print Name: Ken Broach |
| Print Title: Chairman Board of Education Edenton-Chowan Schools | Print Title: Director |
| Date Signed: 3/1/22 | Date Signed: 3/9/2022 |
| | Fed. Tax ID No: 75-2066352 |

Internal

***EXHIBIT D***
***Scope of Construction Work***

**Location:**
**White Oak Elementary School**
**111 Sandy Ridge Road**
**Edenton, NC 27932**

Mechanical Scope of Work:

1. Secure necessary permits and use construction documents provided by Schneider Electric.
2. Isolate and disconnect condenser water piping to thirty-two (32) existing water source heat pumps using available isolation valves in mezzanine or mechanical room. Remove existing flexible hose connectors, isolation valve and balancing valve. Remove condensate p-trap and drain piping as needed to allow for new work.
3. Disconnect electrical and power wiring to unit and save for re-use.
4. Provide thirty-two (32) new water source heat pumps with new isolation valves on supply/return, cartridge type automatic balancing valve, y-strainer, and 18" (minimum length) flexible hose connectors. All new devices shall match equipment connection.
5. Extend supply and return air duct to new equipment connection and include flexible duct connectors. Any return air plenum boxes that may be removed during demolition shall be replaced.
6. Install condensate drain, related trap and extend new piping to existing.
7. Provide water balance and written report at building system and cooling tower pumps.
8. Provide air balance to each new water source heat pump to include supply, return and outside air reading. Provide airside test and balance and written report.
9. Extend existing power and control wiring to new unit.
10. Furnish and install bi-polar ionization device into existing supply air duct of each water source heat pump. Provide transformer and associated power and low voltage wiring on new unit. Bi-polar ionization shall be based on PlasmaAir model Autoclean 1560 or approved equal and sized for the nominal CFM of each unit.
11. Provide equipment startup and validate warranty. Startup services shall include confirmation that all duct mounted smoke detectors are operating.
12. Condenser Water Piping Repairs: Contractor shall replace selective condenser water supply and return 6" size mains and including 2-1/2" piping to WSHP tagged 44, 45 and 46. Refer to concept drawing for schematics and drawing. New piping shall be CPVC schedule 80 and flanged to existing schedule 80 PVC mains.
13. Perform equipment startup services to existing make-up air units. Provide recommended service repairs as needed to recommission the equipment.
14. Repair or replace (as needed) the power wiring whip to existing hot water pump tag P-4.
15. Install new motor on MAU-1 for heat wheel.
16. Replace Belts, Bearings, Pulleys as necessary on MAU 1,2,4. All units will be cleaned, and bearings greased and dampers lubed.
17. Provide cooling tower rebuild as recommended by equipment manufacturer (Evapco):
    - Clean tower interior
    - Replace fill media, drift eliminators and inlet louver material with new
    - Install new OEM bearing and shaft kit
    - Replace Steel Support on one side of tower base.

Automation Scope of Work:

1. Remove thirty-two (32) existing UC400 controllers from WSHP and save for re-use in new units once replaced
2. Re-install thirty-two (32) UC400 controllers inside new WSHP and reconnect all controls wiring

3. Re-use existing Trane temperature sensors
4. Provide point to point commissioning
5. Programming and check out to be performed by Trane Controls Technician

**Location:**
**DF Walker Elementary School**
**125 Sandy Ridge Road**
**Edenton, NC 27932**

Contractor Scope of Work:

1. Secure necessary permits and use construction documents provided by Schneider Electric.
2. Isolate and disconnect condenser water piping to thirty-seven (37) existing water source heat pumps using available isolation valves in mezzanine or mechanical room. Remove existing flexible hose connectors, isolation valve and balancing valve. Remove condensate p-trap and drain piping as needed to allow for new work.
3. Disconnect electrical and power wiring to unit and save for re-use.
4. Provide thirty-seven (37) new water source heat pumps with new isolation valves on supply/return, cartridge type automatic balancing valve, y-strainer, and 18" (minimum length) flexible hose connectors. All new devices shall match equipment connection.
5. Extend supply and return air duct to new equipment connection and include flexible duct connectors. Any return air plenum boxes that may be removed during demolition shall be replaced.
6. Install condensate drain, related trap and extend new piping to existing.
7. Provide water balance and written report at building system and cooling tower pumps.
8. Provide air balance to each new water source heat pump to include supply, return and outside air reading. Provide airside test and balance and written report.
9. Extend existing power and control wiring to new unit.
10. Furnish and install bi-polar ionization device into existing supply air duct of each water source heat pump. Provide transformer and associated power and low voltage wiring on new unit. Bi-polar ionization shall be based on PlasmaAir model Autoclean 1560 or approved equal and sized for the nominal CFM of each unit.
11. Provide equipment startup and validate warranty. Startup services shall include confirmation that all duct mounted smoke detectors are operating.
12. Perform equipment startup services to existing make-up air units. Provide recommended service repairs as needed to recommission the equipment.
13. Replace MAU -1 Heat Wheel
14. Replace Belts, Bearings, Pulleys as necessary on MAU 1,2,4,5,6,7. All units will be cleaned, and bearings greased and dampers lubed.
15. Provide cooling tower rebuild as recommended by equipment manufacturer (BAC):
    - Clean tower interior
    - Replace fill media and fill supports new. Reuse existing stainless-steel supports and louvers.

Automation Scope of Work:

1. Remove thirty-two (37) existing controllers from WSHP and save for re-use in new units once replaced
2. Re-install thirty-two (37) controllers inside new WSHP and reconnect all controls wiring
3. Re-use existing Trane temperature sensors
4. Provide point to point commissioning
5. Programming and check out to be performed by Trane Controls Technician

Internal

**Location:**
**Chowan Middle School**
**2845 Virginia Road**
**Tyner, NC 27980**

**Contractor Scope of Work:**

1. Furnish and install bi-polar ionization device into existing supply air duct of each split DX system air handler unit and each ground package DX unit. Provide transformer and associated power and low voltage wiring on new unit. Bi-polar ionization shall be based on PlasmaAir model Autoclean 1560 or approved equal and sized for the nominal CFM of each unit.

Internal

**EXHIBIT E**
***Preliminary Construction Schedule***

| | |
|---|---|
| Contract Execution | March 1st, 2022 |
| Final Engineering and Bid Documents | March - May 2022 |
| Equipment Ordering | April – June 2022 |
| Installation Period | September 2022 - June 2023 |
| Start Up | Continuous Upon Installation |
| Close Out | July – August 2023 |

***EXHIBIT F***
***Construction Fee***

**Construction Fee:**

The "Construction Fee" payable to Design/Builder in consideration for Design/Builder's performance of the Construction Phase (inclusive of the Design Fee in the amount of $67,500) shall be: $1,598,866.00